# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-KA-01973-SCT

*THOMAS GLYNN FLYNT a/k/a THOMAS FLYNT*
*a/k/a THOMAS G. FLYNT*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 10/21/2013 |
| TRIAL JUDGE: | HON. ROBERT B. HELFRICH |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | PHILLIP BROADHEAD |
| | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LAURA HOGAN TEDDER |
| DISTRICT ATTORNEY: | PATRICIA BURCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/22/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.     Thomas Flynt ("Tommy") was convicted of manslaughter for the death of Teresa Groover, his daughter's girlfriend, after an altercation with Teresa. According to Tommy, he and Teresa were struggling over the gun when it went off, and he does not remember pulling the trigger. Several people were present during the altercation and at the location where Teresa was shot, but no one saw Tommy shoot her. After the trial, Tommy filed a

motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The trial judge denied the motion, and Tommy appeals.

**Factual Background**

¶2.     On April 11, 2009, Tommy Flynt and his family went to a cousin's house for a large family Easter egg hunt. Tommy arrived around noon with his wife, Melissa, and their two children, Charee, fourteen, and Charles, ten. Samantha Crabtree, a friend of Charee's, was with them as well. The adults were drinking, and Tommy admits to having two beers.

¶3.     At some point, Tommy's older daughter, Krystal, arrived with her girlfriend, Teresa Groover. According to Tommy, Krystal tried to pick a fight with him – she shoved him and said she was grown now and could "whip his ass." Tommy decided to leave because of Krystal's behavior; he does not remember what time they left, but he said it was still daylight. Tommy, Melissa, Charles, Charee, and Samantha left the party and went to Tommy's auto repair shop. Tommy testified that, at the shop, Charles went out back to ride a four-wheeler, Charee and Samantha listened to music in the car, and Tommy and Melissa went inside to eat and watch television.

¶4.     Krystal and Teresa showed up at the shop some time later, and Krystal began trying to provoke Tommy again. Tommy claims that Krystal "was in a drunken stupor state." He told Krystal to leave and escorted her outside. Krystal kicked the door open and came back inside, again "leaning" on Tommy and saying things like "try me now." Tommy claims that he repeatedly asked Krystal to leave. Tommy testified that he was trying to ignore Krystal, but she eventually pulled him off the barstool on which he was sitting, so he picked her up

2

by the waist and attempted to carry her outside. As Tommy was carrying Krystal out the door, Teresa walked in.

¶5. Teresa separated Tommy and Krystal, pushing Krystal to the side and slamming Tommy to the floor. Tommy admits that Teresa, a former Marine, was bigger and stronger than he was. Tommy testified that Teresa pinned him to the ground with one hand on his neck, strangling him. Tommy was able to get up, but Teresa took him down a second time. Teresa choked him again, and Tommy claims that he was about to pass out when he heard Krystal say, "Stop T, you're killing him." Tommy testified that Krystal pulled Teresa off Tommy, and Tommy got to his feet. Tommy said he was choking and gasping for air when Teresa got away from Krystal and charged him a third time. Tommy testified that he was able to pry Teresa's hand off his throat and roll out from under her.

¶6. After escaping Teresa for the third time, Tommy testified that he needed something to drink because he said his Adam's apple was stuck in the bottom of his throat and he needed something to loosen it up. He located a beer and drank it. Tommy told his wife to call 911, but she informed him that the phone was broken. He had another phone in his office, so he went to the office in search of a telephone to call the police. Tommy testified that he kept a loaded gun in plain sight in his office. Tommy maintained that he was going to get the telephone, not his gun.

¶7. Tommy testified that Teresa charged into the office and attacked him again. He said Teresa picked him up by the neck, lifted him off the ground, and had him against a shelf. Tommy testified, "She was strangling me. . . . she was in a vicious mode. Slobber was

3

coming out of her mouth, and she was telling me, 'I'm going to kill you, you [expletive].'"

Tommy claimed that he does not know how the gun came into play; he does not remember picking it up. He testified that he does not know if he picked it up or if Teresa picked it up, but they both had their hands on the gun when it went off. He said that he does not remember firing the gun, and he claims he did not even hear it go off. On cross-examination, Tommy testified that Teresa was trying to point the gun at him and shoot him, and he was trying to keep the gun away from himself. He said "it could have just as well been me shot."

¶8.     Tommy testified that Teresa was still choking him and they were still struggling for the gun when the police came in. He testified that the police pulled Teresa off him and took the gun. Tommy said the police officers handcuffed both him and Teresa and made them lie on the floor. He said Teresa was still trying get up and she was looking at him saying "I'm going to kill you, you [expletive]" while she was handcuffed and lying on the floor.

¶9.     Others who were present that day recall the events somewhat differently. Charee Flynt and Samantha Crabtree, both fourteen years old at the time, were the only eyewitnesses to the altercation who testified. However, numerous police officers testified about what they saw when they arrived at the scene after the shooting.

¶10.    Charee testified that all of the adults had been drinking that day; she would not say that her father was intoxicated, just that he had consumed a couple of beers. However, in her original statement, made after the incident when she was fourteen years old, she wrote that Tommy was "very intoxicated." She also wrote that Krystal was intoxicated. At trial, Charee maintained that Krystal was drunk, saying she was slurring her words and staggering, but she

4

said her father was not drunk. Charee agreed that her impression about being intoxicated had changed since she was fourteen and made the statement. Charee said Teresa had been drinking as well, but she was not acting drunk.

¶11. Charee testified that Krystal and Teresa arrived at the shop, and Krystal started arguing with Tommy and shoving him, and Tommy asked her to leave. At trial, Charee said that Tommy was trying to push or pull Krystal toward the door. When presented with her written statement, she admitted that Tommy had grabbed and pushed Krystal. Charee also had written that Tommy choked Krystal, but she would not admit that at trial. Charee testified that Tommy and Krystal started tussling, and Teresa walked in and separated them. Charee testified that Teresa grabbed Tommy "by his throat and took him to the ground."

¶12. Charee testified that while Teresa had Tommy pinned down she was telling him to "stay down and calm down." Charee testified that Teresa let Tommy get up, but then she "took him right back down." However, in her original statement, Charee indicated only that Tommy had been pinned down one time. Charee testified that, after Teresa released Tommy the second time, Tommy asked for something to drink, then he went into his office. Charee testified that Tommy was in the office for two or three minutes before Teresa went in; in her written statement, she wrote that Tommy was in the office for five minutes before Teresa followed him. Charee testified that Teresa walked into the office calmly. She heard someone yell "gun." Charee knew that Tommy kept a gun in his office, but she said it was unloaded because she and her little brother were at the shop often. Charee testified that she could not

5

see Tommy and Teresa after they went into the office, but, in her statement, Charee wrote that Tommy did not appear to be in danger.

¶13. At some point during the altercation, Krystal's shirt and bra came off. Samantha testified that Tommy tore them off when they were fighting, but Tommy said they came off when Teresa pulled Krystal and Tommy apart. Samantha said Teresa came in and split up Tommy and Krystal, putting Tommy in a chokehold until he agreed to stop fighting. Samantha said Teresa was trying to get Tommy to calm down. Samantha testified that, when Teresa let Tommy up, he went into his office. She said Teresa followed Tommy into his office a few seconds later; she was not right behind him. Someone yelled, "He's getting a gun." After they had been in the office a few seconds; the gun went off. Samantha testified that she could see Tommy and Teresa standing in Tommy's office; she could not hear what they were saying, but Teresa did not seem to pose a threat to Tommy.

¶14. According to the 911 call log, a call came in at 8:06 and the caller reported that her husband had just shot her daughter. However, the call log indicated that the caller's name was Teresa Groover. When asked who called 911, Charee testified, "We did." Officer Blaine Stansell was one of the first officers to arrive at the scene. When he arrived, a lady in the parking lot was talking on the telephone, and he assumed she was talking to 911. Stansell entered the building, followed by three other officers. When he approached the office, he saw a female sitting on top of a male. She was straddling him, and they were struggling over a gun. Stansell identified the male as Tommy. He testified that they were sitting on the right side of the couch, and Tommy's back was against a shelf. Stansell

testified that he took the gun away from Tommy, and then he noticed a second female on the couch who was "unconscious and bleeding from the abdomen."

¶15. Sergeant Laron Smith arrived at the scene as well. When he arrived, several officers were there already and several people were standing outside. Contrary to Officer Stansell's testimony, Sergeant Smith testified that he saw Tommy standing over Krystal and Teresa, and he heard Tommy tell Krystal to move so he could "shoot the bitch again." Sergeant Smith said Tommy was pointing the gun at the two females and that Krystal was lying on top of Teresa so Tommy would not be able to shoot her again. He testified that Tommy was irate. After the officers got the gun away from Tommy, Krystal became more irate and tried to attack Tommy, so Sergeant Smith restrained Krystal.

¶16. Lieutenant Dale Bounds also responded to the scene. He initially went around to the side of building, where the air conditioning window unit from the office was located. He could not see into the office, but he could hear a male and a female screaming. Lieutenant Bounds testified that the female said, "Why did you shoot her?" And the male responded, "Move. I was going to shoot and kill her." Lieutenant Bounds then followed Officer Stansell and the others into the building and approached an interior window that looked into the office. He saw a male and a female struggling over a gun and a second female lying on the couch with a gunshot wound to the abdomen.

¶17. Lieutenant Bounds testified that the male, whom he identified as Tommy, "had a gun in his hand, and the female had her hands on his hands trying to keep him from shooting the female again." Lieutenant Bounds said Tommy had full control over the gun and it was

7

pointed toward the female on the couch; when Tommy saw the officers come in, he rotated the gun toward the officers. Lieutenant Bounds had his weapon drawn and was prepared to shoot Tommy when Officer Stansell grabbed the gun from Tommy. Lieutenant Bounds testified that Teresa was not handcuffed, as it is not normal to handcuff someone who is critically injured. He said Teresa was just moaning when they came in. Teresa died from the gunshot wound two days later.

¶18. Photographs from the crime scene were entered into evidence through the testimony of the crime scene investigator, Jeff Byrd. Byrd testified that a photograph of Teresa's gunshot wound showed stippling, indicating that the gun was fired at close range. Investigator Byrd's report indicated that, when officers arrived, Tommy was lying on top of Teresa and Krystal was on top of both of them, and both Tommy and Teresa had their hands on the gun. Byrd swabbed Tommy's hands for gunshot residue. Testing revealed gunshot residue on the front and back of both of Tommy's hands.

¶19. Forensic scientists from the Mississippi Crime Laboratory testified that Teresa did not have drugs or alcohol in her system. However, the alcohol test was performed two days after the incident, and the toxicologist testified that any alcohol that was in her system on the day of the shooting would have been gone by then. The samples for the drug tests were drawn on April 15, four days after the incident, and the toxicologist testified that samples taken postmortem would indicate what was in the body at the time of death, but not two days before death, which was the day of the shooting.

¶20. A firearms analyst testified that the bullet that was taken from the scene was fired from the gun that was taken from the scene. A box of cartridges also was taken from the scene, and it was consistent with the bullet that was fired. The gun in question, a Rossi .38 revolver, holds five rounds. The box of ammunition taken from the scene was open and sitting on a table near the couch; it was missing five bullets. However, one shot had been fired, and only three bullets remained in the gun. Tommy testified that he kept the gun at the shop because he had a lot of cash on hand and it was a deterrent to robbers, but he testified that he had not had to use the gun before. Based on Charee's testimony that Tommy kept the gun unloaded, as well as her testimony that he was in the office for two to five minutes before Teresa went in, the State's theory is that Tommy went into the office and hurriedly loaded the gun, without loading it to capacity, with the intent to shoot Teresa.

¶21. Dr. Thomas Deering performed the autopsy on Teresa. He testified that the bullet entered her upper left abdomen and exited out the right flank. Based on the tight stipple pattern and soot that was present, he testified that there would have been six inches or less between the barrel of the gun and Teresa's skin. Dr. Deering testified that Teresa also had blunt trauma – scrapes and bruises that resulted from falling or getting hit with something – on her knees, chin, and eyebrow. Dr. Deering concluded that the cause of death was gunshot wound to the abdomen and the manner of death was homicide.

¶22. The State paints the relationship between Tommy and Krystal as a tumultuous one, also implying that Tommy had issues with Krystal's and Teresa's relationship. Tommy admitted that Krystal had drug and alcohol problems and said that he had told her she needed

9

to get help. But he said she was his daughter, he loved her, and he did not have anything against her. Tommy also testified that he liked Teresa, he did not have any problems with her, and she was a friend. He said Krystal was "a drughead and an alcoholic," and Teresa made sure that his grandchildren (presumably Krystal's children) were taken care of.

¶23. Tommy was indicted for murder in September 2009. Trial was held in October 2013, more than four years after the shooting. The jury convicted Tommy of manslaughter. He was sentenced to twenty years, with five years suspended and fifteen to serve. After the trial, Tommy filed a motion for judgment notwithstanding the verdict (JNOV) or, in the alternative, for a new trial. The motion was denied and Tommy appealed.

## Discussion

¶24. On appeal, Tommy asserts that the trial court erred by denying his motion for JNOV or for a new trial, because the evidence was legally insufficient to support the jury's verdict and the verdict was against the overwhelming weight of the evidence. He also asserts that the jury could not have fully considered his self-defense claim. We apply an abuse-of-discretion standard of review to post-trial motions, such as motions for JNOV or for a new trial. *Beasley v. State*, 136 So. 3d 393, 401 (¶ 28) (Miss. 2014).

### I. Whether the trial court erred by denying the motion for JNOV.

¶25. A motion for JNOV "challenges the legal sufficiency of the evidence." *Beasley*, 136 So. 3d at 401 (¶ 29) (quoting *Ivy v. State*, 949 So. 2d 748, 751 (Miss. 2007)). The Court has summarized the standard of review for the denial of a motion for JNOV as follows:

> "[T]he critical inquiry is whether the evidence shows 'beyond a reasonable
> doubt that the accused committed the act charged, and that he did so under

10

such circumstances that every element of the offense existed[.]'" ***Id.*** (quoting ***Carr v. State***, 208 So. 2d 886, 889 (Miss. 1968)). In reviewing the sufficiency of the evidence, this Court will view all evidence in the light most favorable to the verdict. ***Bush v. State***, 895 So. 2d 836, 843 (Miss. 2005). If this Court determines that "reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense," this Court will hold that the evidence was legally sufficient to support the jury's verdict. ***Edwards v. State***, 469 So. 2d 68, 70 (Miss. 1985).

***Beasley***, 136 So. 3d at 402 (¶ 29).  Tommy claims that the State's evidence was not legally sufficient to support the jury's verdict.

¶26.    Tommy was charged with deliberate-design murder under Mississippi Code Section 97-3-19(1)(a), which provides: "The killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with deliberate design to effect the death of the person killed, or of any human being, shall be first-degree murder[.]"  Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2014).  The jury instruction on murder read:

> If you find from the evidence in this case beyond a reasonable doubt that:
>
> 1.  On or about April 11, 2009[,] in Forrest County, Mississippi;
> 2.  That Teresa Groover was a human being;
> 3.  That Thomas Flynt without authority of law did willfully and with malice aforethought kill Teresa Groover by shooting her with a gun, all with the deliberate design to effect the death of Teresa Groover;
> 4.  And not in self defense;
>
> then you shall find the defendant guilty as charged.
>
> If the prosecution has failed to prove any one or more of the above listed elements beyond a reasonable doubt, then you shall find Thomas Flynt not guilty of murder.

11

The jury was instructed that if it found the defendant did not have the mental requirement to commit murder, he could be guilty of the lesser-included offense of manslaughter. The manslaughter instruction read:

> If the defendant killed another person with an actual, genuine belief that the killing was necessary in order to protect himself from great bodily harm or death, even though that belief was not reasonable under the circumstances, then the defendant did not have the mental requirement to commit murder. However, the killing may be manslaughter.
>
> If you find from the evidence that:
>
> 1. On or about April 11, 2009, Thomas Flynt shot and killed Teresa Groover;
> 2. Acting with an actual, genuine belief that the killing was necessary in order to protect himself from great bodily injury or death; but
> 3. That belief was not reasonable under the circumstances;
>
> then you may find Thomas Flynt guilty of the lesser included offense of Manslaughter.

The jury also was instructed as to manslaughter in the heat of passion[1] and manslaughter while the victim was engaged in trespass. Tommy asserted a theory of self-defense, and the jury was given a self-defense instruction. He also argued that he was protected by the Castle Doctrine because he was in his place of business, and the jury was instructed accordingly. The jury found Tommy guilty of manslaughter.

¶27. Tommy claims that no rational trier of fact could have found every element of murder or manslaughter. We disagree. Mississippi Code Section 97-3-35 provides that the "killing

---

[1] The jury instruction for manslaughter in the heat of passion read:

If you find that the State has failed to prove any one or more of the essential elements of the crime charged, you must find the defendant not guilty of the charge. You will then proceed with your deliberation to decide whether the State has proved beyond a reasonable doubt all the elements of the lesser crime of Manslaughter while in the heat of passion.

If you find from all the evidence in this case beyond a reasonable doubt that:

1. Thomas Flynt on or about April 11, 2009, in Forrest County, Mississippi;
2. That Teresa Groover was a human being; and
3. That Thomas Flynt did kill Teresa Groover, without malice, but in the heat of passion by the use of a deadly weapon; and without authority of law and not necessary in self defense;

then you shall find the defendant guilty of the lesser included offense of Manslaughter.

If the State has failed to prove any one or more of the above listed elements beyond a reasonable doubt, then you shall find Thomas Flynt not guilty.

If you find beyond a reasonable doubt from the evidence in this case that the defendant is guilty of the crime charged or a lesser crime as defined, but you have a reasonable doubt as to the crime of which the defendant is guilty, you must resolve the doubt in favor of the defendant and find him guilty of the lesser crime which is manslaughter.

13

of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, *or* by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter." Miss. Code Ann. § 97-3-35 (Rev. 2014) (emphasis added). Section 97-3-35 "contemplates alternative theories to sustain a manslaughter conviction in that the crime may be charged as a killing in 'a cruel or unusual manner' *or* 'by use of a deadly weapon.'" ***Booker v. State***, 64 So. 3d 965, 971 (¶ 19) (Miss. 2011) (citations omitted). In the instant case, "a cruel and unusual manner" has not been asserted, but certainly a gun is a "dangerous weapon" and it is undisputed that Teresa died from a gunshot wound. Thus, to convict Tommy of manslaughter, the State was required to prove that Tommy: (1) killed Teresa; (2) with a dangerous weapon; (3) without authority of law; and (4) not in necessary self-defense.

¶28. The jury heard testimony from Tommy Flynt, Charee Flynt, Samantha Crabtree, several officers who responded to the scene, the medical examiner, toxicologists, and a firearms expert. Those who testified presented some contradictory testimony in their accounts of the events that had occurred four years before the trial. However, although an eyewitness did not see Tommy pull the trigger, sufficient evidence pointed to Tommy as the shooter: Tommy admits to fighting with Teresa; testimony indicated that Teresa pinned Tommy down at least twice; Tommy was able to escape from Teresa at least twice and walk to his office; Tommy kept a gun in his office; Teresa was shot in Tommy's office by Tommy's gun; Tommy had gunshot residue on both hands; Tommy had his hands on the gun when police arrived; and two police officers testified that they heard Tommy say something

14

about shooting Teresa and/or wanting to shoot her again.

¶29.    When reviewing a challenge to the sufficiency of the evidence, the Court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Byrd v. State*, 158 So. 3d 1146, 1151 (¶ 14) (Miss. 2015) (quoting *Bush v. State*, 895 So. 2d 836, 843 (Miss. 2005)). We hold that the evidence presented by the State was legally sufficient to allow the jury to conclude, beyond a reasonable doubt, that Tommy was guilty of manslaughter. The trial court's denial of Tommy's motion for JNOV was not an abuse of discretion.

**II. Whether the trial court erred by denying the motion for a new trial.**

¶30.    "A motion for a new trial challenges the weight of the evidence." *Beasley*, 136 So. 3d at 403 (¶ 35). The Court has summarized the standard of review for the denial of a motion for new trial as follows:

> In reviewing a challenge to the weight of the evidence, this Court will overturn a verdict only "when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush*, 895 So. 2d at 844. *See also Amiker v. Drugs for Less, Inc.*, 796 So. 2d 942, 947 (Miss. 2000) (holding that a motion for a new trial is addressed to the discretion of the court and should be granted only "in exceptional cases in which the evidence preponderates heavily against the verdict."). As with challenges to the sufficiency of the evidence, this Court views all evidence in the light most favorable to the verdict. *Id.* Factual disputes are properly resolved by a jury and do not mandate a new trial. *Temple v. State*, 498 So. 2d 379, 382 (Miss. 1986).

*Beasley*, 136 So. 3d at 403 (¶ 35).

**A. Weight of the Evidence**

15

¶31. Tommy asserts that the overwhelming weight of the evidence does not support the jury verdict, because no eyewitness testified that Tommy fired the shots, forensic evidence did not tie Tommy to the shooting, and the police officers' testimony was contradictory. Tommy is correct that no one testified to seeing him fire the shot that killed Teresa. However, as discussed above, sufficient evidence pointed to Tommy as the shooter. Forensic evidence did, in fact, tie Tommy to the shooting – he had gunshot residue on the front and back of both hands and the bullet was fired from his gun. There was no evidence to indicate that Teresa fired the gun. Although Tommy is correct that some of the witness testimony was contradictory, that is a challenge to the witnesses' credibility, and determining credibility of witnesses is a jury function. *Id.*

¶32. The *Beasley* Court discussed a similar situation:

> While Beasley claims that the evidence presented by the State is "unsubstantiated" or "unconvincing," his specific arguments merely challenge the credibility of the State's witnesses. It is not for this Court to pass on the credibility of witnesses, for that is a jury function. *Bond v. State*, 249 Miss. 352, 162 So. 2d 510, 512 (1964) (citation omitted). The jury in this case was presented with two opposing versions of the circumstances surrounding Wilkinson's death. The State presented significant circumstantial evidence portraying Beasley as Wilkinson's murderer. In response, Beasley took the stand in an attempt to rationalize the State's damning evidence, and his testimony is the only evidence inconsistent with the jury's verdict. The jury was free to accept the testimony of some witnesses and reject that of others, and this Court "need not determine with exactitude which witness or what testimony the jury believed or disbelieved in arriving at its verdict." *Brown v. State*, 796 So. 2d 223, 227 (Miss. 2001) (citations omitted). In this case, it is clear that the jury accepted the State's witnesses and evidence and rejected Beasley's testimony. Allowing the jury's verdict to stand in this case would not "sanction an unconscionable injustice," as the evidence does not "preponderate heavily against the verdict." *Bush*, 895 So. 2d at 844. Accordingly, we find that the trial court did not err in denying Beasley's motion for a new trial.

***Beasley***, 136 So. 3d at 403-404 (¶ 36). The same is true in the instant case. While some witness testimony was inconsistent as to specific details, Tommy's testimony was the most different from all the others. The jury has the job of weighing witness testimony and determining credibility. The jury did so, and the evidence does not "preponderate heavily against the verdict" such that allowing the verdict to stand would "sanction an unconscionable injustice." ***Id.***

## B. Defense Theories

¶33. Tommy also asserts that the jury could not have fully considered his theory of self-defense or the Castle Doctrine. The jury was given instructions on both self-defense and the Castle Doctrine. "It is presumed that jurors follow the instructions of the court. To presume otherwise would be to render the jury system inoperable." ***Gray v. State***, 728 So. 2d 36, 63 (¶ 127) (Miss. 1998) (quoting ***Chase v. State***, 645 So. 2d 829, 853 (Miss. 1994)). Thus, the Court presumes that the jury considered the instructions on self-defense and the Castle Doctrine, as well as any related evidence.

¶34. Although it is not disputed that Tommy and Teresa had been fighting, no evidence was presented that Tommy had any bruises, cuts, or scrapes. The photographs entered into evidence showed Tommy's gold chain intact, no readily apparent bruises or cuts, and no hand prints on his neck. Regarding self-defense, the Court has written:

> In order for a homicide to be justified as self-defense, the actor's apprehension of danger must appear objectively real to a reasonable person of average prudence. ***Hart v. State***, 637 So. 2d 1329, 1339 (Miss. 1994). This Court, in ***Wade v. State***, 748 So. 2d 771, 775 (Miss. 1999), held that the issue of justifiable self-defense presents a question of the weight and credibility of the evidence, rather than sufficiency, and is to be determined by jury. This Court

17

further stated that "any factual disputes are properly resolved by the jury and do not mandate a new trial." *McNeal v. State*, 617 So. 2d 999, 1009 (Miss. 1993).

*Jones v. State*, 39 So. 3d 860, 865 (¶ 28) (Miss. 2010). The Court presumes that the jury considered all of the evidence and theories of defense and concluded that Tommy did not act out of "necessary self defense."

¶35. Tommy failed to cite any authority pertaining to the Castle Doctrine or how it should be applied to the facts of his case. Therefore, the issue is procedurally barred. *Rubenstein v. State*, 941 So. 2d 735, 780 (¶ 196) (Miss. 2006) (citing *Bell v. State*, 879 So. 2d 423, 434 (Miss. 2004) ("Failure to cite relevant authority obviates the appellate court's obligation to review such issues."). Procedural bar notwithstanding, the claim is without merit.

¶36. Under the Castle Doctrine, "if the defendant is in a place where he had a right to be, is not the immediate provoker and aggressor, and is not engaged in unlawful activity, he has no duty to retreat before using defensive force." *Newell v. State*, 49 So. 3d 66, 74 (¶ 22) (Miss. 2010) (discussing Miss. Code Ann. § 97-3-15(4)). The Castle Doctrine is codified under the justifiable homicide statute at Mississippi Code Section 97-3-15(3) and (4) as follows:

> (3) A person who uses defensive force shall be presumed to have reasonably feared imminent death or great bodily harm, or the commission of a felony upon him or another or upon his dwelling, or against a vehicle which he was occupying, or against his business or place of employment or the immediate premises of such business or place of employment, if the person against whom the defensive force was used, was in the process of unlawfully and forcibly entering, or had unlawfully and forcibly entered, a dwelling, occupied vehicle, business, place of employment or the immediate premises thereof or if that person had unlawfully removed or was attempting to unlawfully remove another against the other person's will from that dwelling, occupied vehicle,

18

business, place of employment or the immediate premises thereof and the person who used defensive force knew or had reason to believe that the forcible entry or unlawful and forcible act was occurring or had occurred. This presumption shall not apply if the person against whom defensive force was used has a right to be in or is a lawful resident or owner of the dwelling, vehicle, business, place of employment or the immediate premises thereof or is the lawful resident or owner of the dwelling, vehicle, business, place of employment or the immediate premises thereof or if the person who uses defensive force is engaged in unlawful activity or if the person is a law enforcement officer engaged in the performance of his official duties;

(4) A person who is not the initial aggressor and is not engaged in unlawful activity shall have no duty to retreat before using deadly force under subsection (1)(e) or (f) of this section if the person is in a place where the person has a right to be, and no finder of fact shall be permitted to consider the person's failure to retreat as evidence that the person's use of force was unnecessary, excessive or unreasonable.

Miss. Code Ann. § 97-3-15(3), (4) (Rev. 2014). Subsections (1)(e) and (f), referenced in subsection (3), provide:

(1) The killing of a human being by the act, procurement or omission of another shall be justifiable in the following cases:

. . .

(e) When committed by any person in resisting any attempt unlawfully to kill such person or to commit any felony upon him, or upon or in any dwelling, in any occupied vehicle, in any place of business, in any place of employment or in the immediate premises thereof in which such person shall be;

(f) When committed in the lawful defense of one's own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished . . . .

Miss. Code Ann. § 97-3-15(1)(e), (f) (Rev. 2014). To summarize, the Castle Doctrine includes two prongs:

First, under subsection (4), if the defendant is in a place where he had a right

19

> to be, is not the immediate provoker and aggressor, and is not engaged in unlawful activity, he has no duty to retreat before using defensive force. Miss. Code Ann. § 97-3-15(4) (Rev. 2006). And second, if the jury finds that any of the circumstances in subsection (3) are satisfied, the defendant who uses such defensive force is presumed to have reasonably feared imminent death or great bodily harm or the commission of a felony upon him. Miss. Code Ann. § 97-3-15(3) (Rev. 2006).

*Newell v. State*, 49 So. 3d 66, 74 (Miss. 2010). The circumstances in subsection (3) are that the person against whom the defensive force was used (1) had unlawfully and forcibly entered "a dwelling, occupied vehicle, business, place of employment or the immediate premises thereof" or (2) had unlawfully removed another person "against the other person's will from that dwelling, occupied vehicle, business, place of employment or the immediate premises thereof" – or he or she was in the process of doing one of the enumerated things. Miss. Code Ann. § 97-3-15(3) (Rev. 2014).

¶37. As to the first prong, Tommy certainly had a right to be at his auto shop and there was no evidence that he was engaged in any unlawful activity. The testimony points to Krystal as the initial aggressor, with Teresa pinning down Tommy after he tried to remove Krystal from the auto shop. The evidence does not point to Tommy as the "immediate provoker and aggressor." Therefore, he did not have a duty to retreat before using defensive force.

¶38. For the second prong, the jury must find one of the circumstances in subsection (3) for the presumption to apply. There is no evidence that Teresa was attempting to remove another person from the garage, so that situation is not relevant. Regarding unlawful or forcible entry, the record indicates that Teresa was a family friend who would have been welcome in Tommy's garage under most circumstances. Tommy had asked Krystal to leave

20

and was attempting to escort her outside when Teresa came in. There was no testimony that Teresa was not welcome when she arrived or that she had entered unlawfully or forcibly. Once Teresa and Tommy began fighting, her presence may have become unwelcome, but the standard requires that "the person against whom the defensive force was used, was in the process of unlawfully and forcibly entering, or had unlawfully and forcibly entered[.]" Miss. Code Ann. § 97-3-15(3) (Rev. 2014). The evidence does not support, and Tommy does not argue, that Teresa entered the garage unlawfully or forcibly.

¶39.  A question arises however, as to whether Teresa unlawfully or forcibly entered Tommy's inner office, where the shooting occurred. The testimony indicated that Tommy walked into his office to get the phone – according to Tommy, Teresa entered his office after he stopped to drink a beer – and that he did not shut the door behind himself. Teresa then followed him into the office. According to Tommy, Teresa charged after him, only seconds behind him, and he did not have time to close the door. However, Samantha and Charee testified that Teresa walked calmly into the office after Tommy had been in the office for at least a few seconds. No one testified that Tommy told Teresa to leave, or that Tommy fled the office to escape from Teresa, or that Tommy tried to keep Teresa out of the office. Whether Teresa entered the office "unlawfully and forcibly" certainly is unclear. The only testimony that she followed him quickly into the office and that he did not have time to shut the door was from Tommy, but Tommy also testified that he stopped and drank a beer before going into his office.

¶40.  Again, "[f]actual disputes are properly resolved by a jury and do not mandate a new

21

trial." ***Beasley***, 136 So. 3d at 403 (¶ 35) (citing ***Temple***, 498 So. 2d at 382). As in most cases, the instant case is not without factual disputes and discrepancies among witness testimony. However, those issues are for the jury.

> On questions of witness testimony, this Court has held that "[t]he jury determines the weight and credibility to give witness testimony and other evidence." ***Moore v. State***, 933 So. 2d 910, 922 (Miss. 2006) (citing ***Johnson v. State***, 904 So. 2d 162, 167 (Miss. 2005)). This Court "may not 'pass upon the credibility of witnesses and, where the evidence justifies a verdict, it must be accepted as having been found worthy of belief.'" ***Id.*** (quoting ***Davis v. State***, 568 So. 2d 277, 281 (Miss. 1990)).

***Barfield v. State***, 22 So. 3d 1175, 1187-88 (¶ 46) (Miss. 2009). The Court must presume that the jury considered the jury instructions – including the Castle Doctrine instruction and the related evidence and testimony. *See* ***Gray***, 728 So. 2d at 63 (¶ 127); ***Chase***, 645 So. 2d at 853. The evidence presented supports the jury verdict, and the trial court did not err in denying Tommy's motion for a new trial.

### C. The Dissent

¶41. The dissent would reverse Flynt's conviction for a violation of his right to a speedy trial, despite the fact that never during the pendency of the litigation – either now on appeal or below in the trial court – has Flynt raised the issue. Two long-held principles direct us not to consider the issue. First, this Court has long held that issues not raised on appeal are procedurally barred from consideration. ***Hood ex rel. State Tobacco Litigation***, 958 So. 2d 790, 815 (¶ 86) n.17 (Miss. 2007); ***Glover v. Jackson State Univ.***, 755 So. 2d 395, 398 (¶ 7) n.1 (Miss. 2000). Second, the Court will not hold a trial court in error for issues not presented to it for consideration. ***Moffett v. State***, 49 So. 3d 1073, 1101 (¶ 91) (Miss. 2010).

22

¶42. Thus, the only avenue available for review of a speedy-trial issue is through the use of the plain-error doctrine. According to the dissent, the Court is "*obligated* to grant relief on the basis of plain error"; however, Mississippi Rule of Appellate Procedure 28(a)(3) (emphasis added), which provides the basis for the plain-error doctrine, states that the Court "*may*, at its option, notice a plain error not identified or distinctly specified." Accordingly, the Court's decision to utilize plain error is discretionary, not obligatory. "It is the immutable obligation of a court to sit, and to sit only, as an objective and indifferent arbiter of the rights of the litigants." ***Browning v. Shackelford***, 196 So. 2d 365, 373 (Miss. 1967). To place upon ourselves as justices and judges a duty to scour the record in order to discover potential error where none was suggested at any point by any party would be to put the Court in a position too closely resembling that of a interested litigant, and that we shall not do.

¶43. Flynt failed to raise a speedy-trial issue at any time during his trial or appeal, and we now decline to address it utilizing plain error.

**Conclusion**

¶44. The evidence presented by the State was legally sufficient to allow the jury to conclude, beyond a reasonable doubt, that Tommy was guilty of manslaughter. The jury determined the credibility of the witness testimony, and the evidence does not "preponderate heavily against the verdict" such that allowing the verdict to stand would "sanction an unconscionable injustice." Thus, it was not an abuse of discretion for the trial court to deny Tommy's motion for JNOV or for a new trial, and we affirm the judgment of the Forrest County Circuit Court.

**¶45.   CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH FIFTEEN (15) YEARS TO SERVE, AN ADDITIONAL CONSECUTIVE FIVE (5) YEARS TO SERVE, AND FIVE (5) YEARS POST-RELEASE SUPERVISION, WITH CONDITIONS, AFFIRMED. APPELLANT SHALL PAY A FINE IN THE AMOUNT OF $5,000, AND ALL COURT COSTS BEGINNING SIXTY (60) DAYS AFTER RELEASE IN A MONTHLY AMOUNT TO BE DETERMINED BY APPELLANT'S SUPERVISING OFFICER.**

**WALLER, C.J., RANDOLPH, P.J., LAMAR, CHANDLER AND PIERCE, JJ., CONCUR.  KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND KING, J.**

**KITCHENS, JUSTICE, DISSENTING:**

¶46.    When it is clear that an error in the trial court adversely impacted a fundamental right of a criminal defendant, this Court is obligated to grant that defendant relief on the basis of plain-error review.[2] ***Sanders v. State***, 678 So. 2d 663, 71 (Miss. 1996). "It has been established that where fundamental rights are violated, procedural rules give way to prevent a miscarriage of justice." ***Gray v. State***, 549 So. 2d 1316, 1321 (Miss. 1989).  Moreover, the Sixth Amendment right to a speedy trial "is one of the most basic rights preserved by our Constitution." ***Klopfer v. North Carolina***, 386 U.S. 213, 226, 87 S. Ct. 988, 995, 18 L. Ed. 2d 1 (1967).   In this case, 1,483 days passed between Thomas Flynt's indictment and his trial.  Because Flynt's right to a speedy trial clearly has been violated and this violation goes unaddressed by the majority, I respectfully dissent.

---

[2]Thomas Flynt, the criminal defendant in this case, has been limited by the arguments made by his counsel at both the trial and appellate level.  Thus, because Flynt challenges only the weight of the evidence in his brief on appeal, we cannot consider some of the more interesting, novel arguments that are lurking beneath the surface. For example, whether the Castle Doctrine automatically renders insufficient the evidence supporting a conviction for manslaughter is not before this court at present.

24

**Constitutional Right to a Speedy Trial**

¶47.    The right to a speedy trial is secured by the Sixth Amendment to the United States Constitution and Article 3, Section 26, of the Mississippi Constitution. U.S. Const. amend. VI ("*In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial*, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.") (emphasis added); Miss Const. art. 3, § 26 ("In all criminal prosecutions the accused shall have a right to be heard by himself or counsel, or both, to demand the nature and cause of the accusation, to be confronted by the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and, *in all prosecutions by indictment or information, a speedy and public trial* by an impartial jury of the county where the offense was committed.") (emphasis added).  To analyze constitutional speedy-trial claims, we utilize the four-part test articulated by the United States Supreme Court in ***Barker v. Wingo***, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), which balances: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) the prejudice to the defendant.  The ***Barker*** Court explained that each case should be considered on an "ad hoc basis" and that no one factor is outcome determinative.  *Id.* at 530. The Court wrote:

> We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.

Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.

*Id.* at 533.

### (1) Length of the Delay

¶48.    The constitutional right to a speedy trial attaches "at the time of a formal indictment or information or else the actual restraints imposed by arrest and holding to a criminal charge." ***Handley v. State***, 574 So. 2d 671, 674 (Miss. 1990) (quoting ***Lightsey v. State***, 493 So. 2d 375, 378 (Miss. 1986), *superceded by statute on other grounds*).  Flynt was indicted on September 24, 2009. His trial began on October 15, 2013.  Some 1,483 days passed between Flynt's arrest and indictment. This Court has held that a delay of eight months, or 270 days, is "presumptively prejudicial." ***Johnson v. State***, 68 So. 3d 1239, 1247 (Miss. 2011).  The United States Supreme Court has held that "the presumption that pretrial delay has prejudiced the accused intensifies over time." ***Doggett v. United States***, 505 U.S. 647, 652, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992). The delay in this case, 1,483 days, exceeds this Court's "presumptively prejudicial" threshold more than fivefold.  This factor weighs heavily against the State.

### (2) Reason for the Delay

¶49.    As for ***Barker***'s second criterion, the Court weighs governmental negligence heavily against the State. *See* ***Doggett***, 505 U.S. at 652-653.  The record is clear regarding the reason for the delay. Flynt's trial was scheduled to commence on February 22, 2010.  Because the prosecutor had another trial scheduled on that date, the trial was rescheduled for May 24,

26

2010, 243 days after Flynt had been indicted. On May 25, 2010, the State moved, *ore tenus*, for the case to pass to the Circuit Court of Forrest County's inactive files. The State averred that it was not prepared to go to trial because "some evidence has been misplaced, lost, or inadvertently destroyed while in the custody of the Hattiesburg Police Department." This case remained in the inactive files of the court until June 21, 2013, when the State filed a motion to reinistate the case to the Circuit Court of Forrest County's active docket. The State contended that there was no speedy-trial issue with reactivating the case because "the defendant has been at liberty since the time of his indictment." When the State filed the motion to reactivate the case, 1,367 days had elapsed since the date Flynt was indicted. The prosecutor implied that the State's failure to prosecute the case was due to the district attorney's prosecutorial discretion. The prosecutor explained that, "a different District Attorney and Assistant District Attorney . . . passed [the case] to files. . . . The indictment came down in September of [20]09. It was passed on May 25, [20]10, and reinstated on July 25, 2013, *under the new administration*." (Emphasis added.) After the case was reactivated from the court's files, a trial date was set for October 15, 2013.

¶50. In this case, the government's negligent loss of its own evidence and failure to investigate the case should be weighed heavily against the State and not at all against the accused. Moreover, the case had remained dormant in the circuit court's files for more than three years because the district attorney had decided not to pursue this charge. The government's decision to forego or defer prosecution in this case should be weighed heavily against the State for the purpose of a speedy-trial analysis.

27

*(3) Whether the defendant asserted his right to a speedy trial.*

¶51.   Next, we must consider whether Flynt asserted his right to a speedy trial.  The record is clear that Flynt did not raise this right in the trial court.  However, this must be considered in light of the circumstances of the case.

¶52.   On May 25, 2010, the State made an *ore tenus* motion to pass this case to the circuit court's inactive files 243 days after Flynt had been indicted.  In other words, when the case was active, Flynt's constitutional right to a speedy trial had not been implicated, because 270 days had not  passed.  *See Johnson*, 68 So. 3d at 1247.  "It is not the duty of the accused to bring himself to trial. . . . It is the State, of course, that bears the burden of bringing an accused to trial in a speedy manner." *McGhee v. State*, 657 So. 2d 799, 804 (Miss. 1995) (citations omitted).  A prosecutor's decision to pass a case to the circuit court's files, in effect, holds the indictment in abeyance or acts as a dismissal without prejudice.  *See Ross v. Milner*, 194 Miss. 497, 12 So. 2d 917, 919 (Miss. 1943) ("[T]he Court said in view of the fact that the indictment had been remanded to the files that 'If it be true that the indictment in question was filed away as claimed by appellant, then there was no prosecution pending in court at the June term; hence no order forfeiting the bond could be legally made, nor could any judgment be legally rendered upon said bond, and such judgment would be clearly erroneous, if not absolutely void.'") (quoting *Hall v. Commonwealth*, 17 Ky. Law Reptr. 231, 30 S.W. 877 (1895)).  Because passing a case to the files operates as a dismissal without prejudice, we have recognized in the past that a "district attorney may be willing to pass an indictment to the files pending good behavior, or for other cause, when he would be

28

unwilling to recommend a *nolle prosequi*, and it often happens that a defendant is willing to accept this arrangement as the best settlement available." ***Gordon v. State***, 127 Miss. 396, 90 So. 95 (1921). Furthermore, we have held that a prosecutor's decision to pass an indictment to the court's inactive files, like an order of *nolle prosequi*, is not an acquittal on the merits and does not implicate a criminal defendant's right against double jeopardy. ***Beckwith v. State***, 615 So. 2d 1134, 1147 (Miss. 1992). However, it is clear that while the case remains in the circuit court's files, the case is inactive. ***Ross***, 12 So. 2d at 919. Therefore, if the defendant were to file a motion in circuit court while his criminal case was inactive, any judgment the court made on that motion would be void. *See **id.*** Thus, at the point in time that Flynt's constitutional right to a speedy trial attached, his case was in abeyance, there was no reason for him to press a speedy-trial claim, and, even if he had filed a motion concerning the length of the delay in this case, any judgment that may have issued on his speedy-trial motion would have been void. *See **id.***

¶53. Flynt's indictment remained dormant in the court's inactive files from May 25, 2010, until June 24, 2013. At that time, the trial court reinstated the State's case on its active docket on the prosecutor's motion. When the Court reinstated the case to its active docket, 1,369 days had passed since Flynt had been indicted. The trial court scheduled Flynt's trial for October 15, 2013, giving Flynt a little more than three months to prepare for trial. By this time Flynt was being represented by the Office of the Public Defender and not the private attorney who represented him prior to the passing of his case to the court's inactive files. Flynt's new trial counsel averred that the file containing the defense's investigative materials

29

had been kept in a storage unit during the time that Flynt's case was inactive. While the defense investigative file was in storage, it suffered severe water damage. Flynt's trial attorney asserted that the file had been damaged beyond repair and that she could not be sure of what the file contained, but she believed it included the results of investigations into the case and interviews done with witnesses. The defense attorney asserted that she needed to reconstruct the contents of the file, but she would not have time to do so in time for the October 15, 2013, trial date. The trial court denied Flynt's motion for a continuance for the purpose of reconstructing the case file. Thus, during the time his case was reinstated to the trial court's active docket, it was clear that all preparation that had been done for his original trial had been destroyed. Under these circumstances, Flynt understandably sought and was denied a continuance and did not assert his right to a speedy trial.

¶54.    Thus, because Flynt did not raise his right to a speedy trial in the trial court, this factor weighs against him. *Jaco v. State*, 574 So. 2d 625, 632 (Miss. 1990). But, given the unique circumstances of this case, it is readily understandable and should not weigh against him.

*(4) Prejudice to the Defendant*

¶55.    The United States Supreme Court has held that unreasonable pretrial delay threatens to produce more than one sort of harm, including "oppressive pretrial incarceration," "anxiety and concern of the accused," and "the possibility that the [accused's] defense will be impaired" by dimming memories and loss of exculpatory evidence. *Barker*, 407 U.S. at 532. Of these forms of prejudice, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.*

30

¶56.    In this case, Flynt was not incarcerated between his indictment and his trial. Moreover, the record is devoid of information concerning his anxiety or concern regarding trial.  But the record is clear that Flynt's defense suffered significant impairment as a result of the delay in this trial.  When the State moved to pass this case to the court's inactive files, the prosecution informed the judge that it was not prepared to go to trial because "some evidence has been misplaced, lost, or inadvertently destroyed while in the custody of the Hattiesburg Police Department."  The record is unclear about the nature of this evidence, given that it was destroyed.    But, it is well established that criminal defendants have a significant constitutional interest in evidence that is "material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).  In *Barker*, the United States Supreme Court explicitly recognized that impairment of an accused's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony "can rarely be shown." *Barker*, 407 U.S. at 532.   "And though time can tilt the case against either side, one cannot generally be sure which of them it has prejudiced more severely." *Doggett*, 505 U.S. at 655.   Thus, the United States Supreme Court has held that the destruction of evidence "*presumptively compromises the reliability* of a trial in ways that neither party can prove or, for that matter, identify." *Id.* at 655 (emphasis added).

¶57.    But the Hattiesburg Police Department's loss of evidence was not the only instance in which the record is clear that evidence dissipated prior to Flynt's trial.  During the time that Flynt's case lay in the inactive court files, Flynt's original lawyer had stored his case file,

31

complete with the results of investigations and interviews. During the course of the three-year delay, the case file suffered irreparable damage, and Flynt lost the benefit of all of the file's contents.

¶58. It therefore is clear that Flynt suffered actual prejudice by the delay in his trial due to loss of evidence. *See **Doggett***, 505 U.S. at 655.

## Conclusion

¶59. Having conducted a thorough ***Barker*** analysis, I believe that Flynt's federal and state constitutional rights to a speedy trial clearly have been violated. I respectfully dissent.

**DICKINSON, P.J., AND KING, J., JOIN THIS OPINION.**