# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-KA-01088-SCT

*MARIO RAGLAND a/k/a MARIO DARNELL RAGLAND*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/30/2016 |
| TRIAL JUDGE: | HON. ROBERT P. CHAMBERLIN |
| TRIAL COURT ATTORNEYS: | ROBERT A. CHAMOUN |
| | JENNIFER LYNN MUSSELWHITE |
| | MICHAEL DARIN VANCE |
| | JOHN W. CHAMPION |
| COURT FROM WHICH APPEALED: | DeSOTO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LISA L. BLOUNT |
| DISTRICT ATTORNEY: | JOHN W. CHAMPION |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED -11/30/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.     A DeSoto County jury found Mario Ragland guilty of armed robbery and conspiracy to commit armed robbery. Ragland appeals his convictions, claiming there was insufficient evidence to support either conviction, and the jury verdicts were against the overwhelming weight of the evidence. Ragland also claims the trial court erred in allowing accomplice

instructions to be submitted to the jury under the evidence of this case, and that those given were either defective or incomplete. He further contends his trial counsel was constitutionally ineffective for failing to object to the accomplice instructions, and for requesting an accomplice instruction on behalf of the defense that was incomplete or incorrect.

¶2. Finding no reversible error, we affirm.

**FACTS**

¶3. Shortly after 3:00 a.m. on November 17, 2014, Tamieka Campbell Manning, an employee at the Krystal restaurant on Craft-Goodman Road in Olive Branch, Mississippi, was cleaning the restaurant when she turned around and saw a gun in her face. A black male wearing a blue hoodie, surgical mask, gloves, and shiny black shoes, and brandishing a black revolver, demanded money and ordered Manning and two other Krystal employees to the back of the restaurant, where the office and a safe was located. There, the man took Krystal envelopes, along with a Krystal money bag, each filled with money. Afterward, the man ordered Manning and the other Krystal employees to lie on the floor and cover their heads. Manning saw the man leave Krystal from surveillance cameras in the office. She could not see anything outside the Krystal. Manning reported the robbery to 911 within a minute or two after the man left the restaurant.

¶4. Olive Branch Police Officer David Rumbarger was on patrol in the area when he received a dispatch at approximately 3:06 a.m. regarding a robbery that had just occurred at the Krystal restaurant by a suspect described as a black male. Rumbarger drove to a location

2

on Highway 78 where he thought a suspect might flee; positioned his patrol car, turned on his dash camcorder, and began shining his spotlight toward oncoming traffic traveling westbound from the area of Krystal's location so he could see the occupants inside the passing vehicles. Rumbarger spotted a vehicle traveling at a high rate of speed which slowed down as it approached his location and then sped back up. Rumbarger testified that he saw two black male occupants in the vehicle. Rumbarger said he pulled out behind the vehicle, which "continued to pick up speed at a high rate of speed." Rumbarger turned on his blue lights and siren for the purpose of stopping the vehicle. Rumbarger caught up to the vehicle as the vehicle was approaching an intersection where other vehicles were stopped at a red light. As Rumbarger got closer, the subject vehicle, with its turn signal activated, maneuvered into the left turning lane, the light for which was showing green for traffic turning left. When Rumbarger pulled up directly behind the vehicle, the vehicle then maneuvered back into the westbound traffic lane, pulling in front of traffic still stopped at the intersection's red light. The vehicle proceeded through the intersection, maneuvering across both westbound lanes and then onto the right shoulder of the highway, as though it were about to stop. The vehicle, however, continued moving, getting back on Highway 78 until eventually pulling over approximately thirty seconds later, inside the city limits of Memphis, Tennessee.

¶5.    Once stopped, Rumbarger ordered both occupants to remain in the vehicle with their hands up. When backup arrived, Rumbarger ordered the driver out of the vehicle, and another officer placed Ragland in handcuffs. The passenger subsequently was ordered out

3

of the vehicle and also handcuffed. Both occupants were cooperative, according to Rumbarger. Ragland was the driver of the vehicle, and he told Rumbarger the reason he did not stop immediately was because the vehicles's brakes were sticking. The passenger of the vehicle was identified as Elbert Nichols.

¶6. Olive Branch Detective Aaron Curtis assisted in the investigation of the Krystal robbery. Curtis responded to Krystal, where he watched surveillance video of the robbery. He then went to the location of the traffic stop, where Memphis police were then assisting. Curtis testified that Nichols's clothes matched the clothes of the individual shown on Krystal's video surveillance.

¶7. Curtis photographed evidence as Memphis police inventoried the inside of the vehicle. They found a money bag and envelopes taken from Krystal inside the glove compartment, and a Krystal envelope on the passenger-side floorboard; a Colt .38 revolver in the center console, a round of ammunition on the floorboard, blue latex gloves, and surgical masks. Latex gloves also were found on Ragland which matched the gloves worn by the suspect inside Krystal, according to the surveillance video.

¶8. Ragland and Nichols were arrested and taken to the Memphis Police Department. Detectives interviewed Ragland after he was read his *Miranda* rights.[1] Ragland denied being at the Krystal or knowing anything about the robbery. He said Nichols had picked him up from an apartment where he had stayed the night. Ragland told detectives Nichols came to the apartment and stayed for a minute, before the two left in the vehicle in which Nichols

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

had arrived, with Ragland driving because Nichols was tired. Shortly thereafter, police pulled them over.

¶9. After the State's case-in-chief at trial, the defense moved for a directed verdict, which the trial court denied. Ragland thereafter testified in his own defense. According to Ragland, he was with a girl named Camille Patterson at an apartment complex on Stateline Road. Around 11:00 p.m., Ragland called Nichols asking for a ride home because he had to be at work early the next morning. Ragland said he worked as a custodian at the Shelby County Schools, and his job required him to wear gloves. Ragland testified Nichols got to the apartment around 3:00 a.m. and came inside the apartment, where they talked for about ten minutes before he and Ragland left. Nichols asked Ragland to drive because Nichols said he had been driving all day and was tired. Ragland could not remember the name of the apartment complex but said it was on Stateline Road.

¶10. When asked about being stopped by the police, Ragland said that, as the police vehicle approached them from behind, he was in the process of slowing down to make a left-hand turn and he noticed the vehicle's brakes were sticking. Therefore, he continued through the intersection and then merged in front of the traffic sitting at the intersection's red light. Ragland said he had no idea there was money in the glove compartment and a gun in the console. Ragland testified that he asked the officer if he could get his girl to come down to the traffic stop to tell them he had just left her apartment. But the officer told Ragland he was messing with a crime scene. Ragland said no one mentioned the robbery until he was taken to the Memphis Police Department.

¶11. Ragland told the jury that he called Patterson on a cell phone while sitting in the back of the police vehicle. He said Patterson went to the scene of the traffic stop and sat across the street watching, and that the police would not allow her to come over and tell them Ragland had just left her apartment. Ragland said he told officers how they could get in touch with her, but they did not care to and never asked for her address in Memphis. According to Ragland, Patterson could not attend his trial as a witness because she was shot in the head two to three days after Ragland's arrest.

¶12. On rebuttal, Lieutenant Joshua Mucciarone testified on behalf of the State. Mucciarone said that, as a patrol officer, he is familiar with the streets and apartment complexes located in the area off Stateline Road. He marked the location on a map of Krystal entered into evidence, showing the location of the traffic stop and the location of two apartment complexes in the area. According to Mucciarone, it is 3.5 miles from Krystal to Plantation Apartment Complex, and it takes approximately seven minutes to drive the distance. And it is 4.7 miles from that complex back to the location where Rumbarger first spotted the suspect's vehicle, a distance that takes about ten to twelve minutes to drive.

¶13. Mucciarone, who was on patrol the morning of the Krystal robbery, assisted Rumbarger at the scene of the traffic stop. Mucciarone said he handcuffed Ragland and placed him in the back of the police vehicle. He said no one came to the scene on behalf of Ragland, and he did not see Ragland speak to anyone.

## DISCUSSION

### I. Sufficiency of the Evidence; Weight of the Evidence

¶14. Ragland claims the evidence presented at trial was insufficient to support his convictions for armed robbery and conspiracy, and the jury's verdicts for each conviction were against the overwhelming weight of the evidence. Ragland contends the State's theory for the armed-robbery count was that Ragland had aided and abetted Nichols in carrying out the armed robbery at Krystal. And for the conspiracy count, the State argued that he and Nichols had entered into a common plan to commit armed robbery, knowingly intending to further that plan. But Ragland submits the State's case against him was based entirely on circumstantial evidence, which requires a reviewing court to scrutinize the jury's verdict more closely. Ragland maintains that his presence in an automobile with Nichols proves nothing. Ragland argues the State's evidence does not reasonably exclude the hypothesis that Nichols picked him (Ragland) up at an apartment complex after Nichols committed the robbery and that he (Ragland) had no knowledge of the robbery. Ragland maintains that his own testimony supports a reasonable hypothesis consistent with innocence, and the jury's verdicts in this case are so contrary to the credible evidence presented in support of that hypothesis that a miscarriage of justice would result were the verdicts affirmed.

¶15. When assessing the legal sufficiency of a conviction, a reviewing court determines "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Cotton v. State*, 144 So. 3d 137, 142 (Miss. 2014). This Court will reverse and render a conviction "[i]f facts and inferences considered by the Court point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not

7

have found beyond a reasonable doubt that the defendant was guilty." *Edwards v. State*, 469 So. 2d 68, 70 (Miss. 1985).

¶16. When reviewing a trial court's denial of a defendant's motion for a new trial challenging the weight of the evidence, we will not disturb the jury's guilty verdict unless the record before this Court demonstrates that the verdict is "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. *Miller v. State*, 980 So. 2d 927, 929 (Miss. 2008). "In determining whether a jury verdict is against the overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial." *Id*. (quoting *Boone v. State*, 973 So. 2d 237, 243 (Miss. 2008)).

¶17. In support of his claim that the State failed to prove its case with sufficient evidence, and that his presence in the vehicle with Nichols is not proof of the commission of any crime, Ragland cites the following cases: *McRee v. State*, 732 So. 2d 246 (Miss. 1999); *Corbin v. State*, 585 So. 2d 713 (Miss. 1991); *Shepherd v. State*, 403 So. 2d 1287 (Miss. 1981); and *McClain v. State*, 198 Miss. 831, 24 So. 2d 15 (1945).

¶18. In *McClain*, this Court reversed and rendered a defendant's conviction for grand larceny of an automobile, where the only evidence presented was a thumbprint of the defendant found on the vehicle's rear-view mirror by authorities after recovering the stolen vehicle. *McClain*, 198 Miss. at 836-37, 24 So. 2d at 16. *McClain* held that, while the thumbprint was conclusive evidence of the defendant's identity and presence in the vehicle,

8

it alone was not "equivalent to evidence of guilt of a particular crime." ***McClain*** explained: "No witness testified to having seen appellant in Clarksdale on the night the car was stolen, or on the day it was recovered; and, as stated, there is no evidence in the record of any kind as to when, or under what circumstances, this print was made on the rear-view mirror."

¶19.     ***Shepherd*** reversed and rendered a burglary conviction, finding that the evidence presented justified no more than a suspicion. ***Shepherd***, 403 So. 2d at 1288.  Property consisting of knives and other various items was stolen from an auto parts store some time during the night.  ***Id***. at 1287-88.  That same night, before anyone had discovered the burglary, officers patrolling the area noticed the defendant's truck parked in an alley next to a laundromat located a few hundred yards from the auto parts store.  ***Id***. at 1288.  The officers stopped  and spoke to the defendant, who told them he was there to wash his clothes.  The officers did not see any clothes, and they saw that the defendant had a new knife which he said he had bought recently in Mobile.  The officers did not arrest the defendant, nor did they take his knife.  The next day after the burglary was discovered, one of the officers who had spoken to the defendant the night before found numerous knives stolen from the auto parts store, of the same brand the defendant was carrying, wrapped in a shirt lying next to the laundromat.  During the investigation, officers brought the defendant's brother in for questioning.  He gave a written statement that the shirt found by the officers  was "one that my brother, Danny, had wore."  At trial, however, when called by the State as a witness, the brother denied the shirt found and presented at trial was his brother's.  ***Id***.

¶20.    In assessing the sufficiency of the evidence, the **Shepherd** Court concluded that it amounted to "no more than a suspicion." **Id**. **Shepherd** noted that no one had testified that the shirt found by authorities "was the shirt the defendant was wearing the day of the crime, or whether he had a shirt on" when officers saw him the night of the crime. **Id**. One of the two officers who had encountered the defendant that night did not testify at trial, and the other could not remember at trial. **Id. Shepherd** then reiterated that "Courts cannot permit a conviction to stand based merely upon suspicion, **Wooldridge v. State**, 274 So. 2d 131 (Miss. 1973)." **Shepherd**, 403 So. 2d at 1288.

¶21.    **Corbin** reversed and rendered a burglary conviction, where the defendant was alleged to have broken into a small grocery store sometime during the evening. **Corbin**, 585 So. 2d 713. Similar to **McClain**, the **Corbin** majority found the only proof of the defendant's guilt was fingerprint evidence taken from cigarette cartons allegedly stolen from the grocery store. **Id**. at 715-16. The record evidence in Corbin showed that the same evening the grocery store was burglarized, and before the burglary was discovered, a patrol officer had happened upon an unidentified black male walking down the street a couple of blocks from the grocery store. **Id**. at 714. As the officer approached him, the man dropped various items he was carrying and ran. The items were later identified as goods taken from the grocery store and were processed for fingerprints. Four latent prints taken from the cigarette cartons were matched to the defendant. **Id**.

¶22.    Citing **McClain**, the **Corbin** Court found these facts alone did not prove the defendant was the person who unlawfully entered the grocery store with intent to steal merchandise.

*Corbin* noted that no fingerprints were recovered from the store to place the defendant at the scene, and nothing else was presented to focus the possibilities of the fingerprints being concurrent with the burglary. *Id*. at 715-16.

¶23.   Lastly, in *McRee*, this Court reversed and rendered a burglary conviction of a dwelling, affirmed by the Court of Appeals, which was based entirely on circumstantial evidence. *McRee*, 732 So. 2d 246.  There, a residence allegedly was broken into on a Sunday morning while the residents were at church.  *Id*. at 247-48.  Neighbors reportedly saw two white males driving around the neighborhood that same morning in a vehicle later determined to be the defendant's.  *Id*.  One of the neighbors saw the vehicle drive past the residence twice.  Another neighbor saw the defendant drive onto the residence's property and up to the shop located on the side of the residence, and tap his horn.  *Id*. at 248.  The neighbor confronted the defendant and asked him what he was doing there.  The defendant said he was looking for a girl named "Shanna."  After being told that "Shanna" did not live there, the defendant left and did not return.  When the homeowners returned from church, they found their house had been forcibly entered and that a pocketknife was missing from inside the home.  *Id*.

¶24.   In reviewing the State's evidence, the *McRee* Court found that, when viewed in the light most favorable to the State, the evidence gave "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged."  *Id*. at 250 (quoting *Shields v. State*, 702 So. 2d 380, 382 (Miss. 1997)).  Specifically, the *McRee* Court found the circumstantial evidence in the case was insufficient to prove the defendant was

involved in the burglary to the exclusion of any other reasonable hypothesis, "particularly the statements given by [the defendant] to the neighbor and later to law enforcement that he was in the area looking for a young lady named Shanna." *Id*. Therefore, "a reasonable jury must necessarily have entertained a reasonable doubt." *Id*. (citation omitted).

¶25.    We find *McRee*, *Corbin*, *Shepherd*, and *McClain* distinguishable from the case before us.  First, unlike in those cases, substantial direct evidence was presented in this case as to who actually perpetrated the crime, and when it occurred.  There never was any real question at trial that Nichols was the person who committed the robbery inside the Krystal restaurant at approximately 3:00 a.m. on November 17.  Second, while Ragland's alleged participation in the crimes charged was predicated wholly on circumstantial evidence, that evidence as a whole sufficiently negated any other reasonable hypothesis or theory of innocence in the case.

¶26.    The vehicle Ragland was driving, in which Nichols was a passenger, was pulled over by authorities at approximately 3:11 a.m.  Recovered from the vehicle were a Colt .38 revolver, latex gloves and surgical masks, ammunition, and an envelope, along with a money bag from Krystal.  Latex gloves, similar to those used by Nichols, also were found on Ragland's person.

¶27.    Ragland told authorities he had not been to Krystal, and he did not know a gun was in the vehicle or that the vehicle's glove compartment contained an envelope of money from Krystal.  Photographs taken of interior of the vehicle and later submitted to the jury showed latex gloves and a Krystal envelope on the passenger-side floorboard.  The photographs

12

showed surgical masks located in plain view in a compartment above the vehicle's gear shift, ammunition on the passenger-side floorboard, a money bag taken from Krystal located in the glove compartment, and a revolver sitting in the vehicle's center console.

¶28.    According to Ragland's testimony at trial, Nichols had picked him up from an apartment complex somewhere on Stateline Road shortly after 3:00 a.m. Nichols came inside the apartment, where they talked for about ten minutes. When Ragland and Nichols left the apartment, Nichols asked Ragland to drive. Shortly after leaving the apartment complex, they were pulled over by law enforcement.

¶29.    Ragland maintains on appeal that the jury was required to accept this version of events because it presents a reasonable hypothesis consistent with innocence. We disagree.

¶30.    During its case-in-chief, and again on rebuttal following the defense's case-in-chief, the prosecution presented evidence that no apartments complexes are located near Krystal. According to Rumbarger, who pulled Ragland over, "[r]elative to the time, there's no way that anyone could get to an apartment complex between when I came in contact with them and travel from Krystals." According to Mucciarone, it is 3.5 miles from Krystal to the nearest apartment complex and it takes approximately seven minutes to drive the distance. And it is 4.7 miles from that complex back to the location where Rumbarger first spotted the suspect's vehicle, a distance that takes about ten to twelve minutes to drive.

¶31.    From the facts and circumstances of this case, the jury rationally could find that Ragland's explanation to authorities and his claim at trial, that Nichols had just picked him up from an apartment complex, was implausible and false. The temporal proximity between

13

the reported armed robbery and the time Ragland and Nichols were stopped by authorities leads to a reasonable inference that Ragland was with Nichols at Krystal at the time of the armed robbery and before it occurred. And, based on the evidence found inside the vehicle, the jury reasonably could infer that Ragland was in possession of latex gloves found on his person for the same reason Nichols was in possession of his: to participate in an armed robbery planned and carried out at Krystal.

¶32. Based on our review of the record, the proof in this case supports a reasonable conclusion that Ragland and Nichols had a pre-arranged plan to rob Krystal, and that Ragland aided and abetted Nichols in carrying out the armed robbery itself.

¶33. Further, the evidence does not "preponderate heavily" against the jury's guilty verdicts such that allowing the verdicts to stand "would sanction an unconscionable injustice." *Flynt v. State*, 183 So. 3d 1, 11 (Miss. 2015). The jury is the judge of the weight and credibility of the witnesses' testimony, and it is free to reject all or some of each witness's testimony. *Johnson v. State*, 477 So. 2d 196, 206-07 (Miss. 1985).

¶34. This issue is without merit.

**II. Whether accomplice instructions should have been given or whether those given were ineffective or incomplete.**

¶35. Ragland contends the following instructions were either unsupported by the evidence or failed to conform with requirements of *Milano v. State*, 790 So. 2d 179 (Miss. 2001).

> Instruction 11 (S-4): Participation in an armed robbery is sufficient to make one a principal in the crime regardless of whether that participant was the person holding the weapon.

14

Instruction 12 (S-5): One who willfully, unlawfully, and feloniously aids, abets, assists, or otherwise encourages the commission of a crime is just as guilty under the law as if he or she had committed the whole crime with his or her own hand.

Instruction 15 (D-3): An accomplice is a person who intentionally and voluntarily joins with another person in committing a crime.

¶36. The State contends that Ragland is procedurally barred from complaining about these instructions because he did not object to the State's instructions at trial and submitted his own accomplice instruction.

¶37. This Court repeatedly has held "that an offended party's failure to object to jury instructions at trial procedurally bars the issue on appeal." *Neal v. State*, 15 So. 3d 388, 397 (Miss. 2009) (quoting *Smith v. State*, 835 So. 2d 927, 939 (Miss. 2002)). Further, a defendant will not be heard on appeal to complain about a jury instruction given at his request. *Musselwhite v. State*, 212 Miss. 526, 54 So. 2d 911 (1951); *Long v. State*, 163 Miss. 535, 141 So. 591 (1932). Therefore, Ragland is left to a claim of plain error, review of which is subject to this Court's discretion, procedural bar notwithstanding. *Thomas v. State*, 126 So. 3d 877, 879 (Miss. 2013).

¶38. Ragland maintains that the State's entirely circumstantial evidence against him is an important factor in this case. Ragland cites *Brazile v. State*, 514 So. 2d 325 (Miss. 1987), in which the defendant and his codefendant were arrested when they were discovered speeding from the scene of a store burglary. After a seventeen-mile chase, their vehicle was stopped. The defendant was the driver and his codefendant was the passenger. New clothing, complete with hangers and price tags, was piled in the back seat of the car and in

the trunk. The price tags indicated that the clothing had come from the store just burglarized. At trial, the trial court provided an aiding-and-abetting jury instruction at the State's request. *Id*. at 325-26.

¶39. The *Brazile* Court held that the instruction constituted reversible error and remanded the case for a new trial. *Id*. at 326. *Brazile* found that, even though sufficient circumstantial evidence showed that both defendants were present and actually participated in the commission of the burglary, there was "no evidence that either of the defendants aided or abetted the other." *Id*. *Brazile* further found the instruction awkward and misleading as written because it appeared to allow the jury to determine that, if both defendants committed the crime, only the defendant, Clovis Brazile, could be found guilty. *Id*. The instruction also erroneously implied that neither defendant needed to have been present at the burglary to be found guilty. *Id*.

¶40. We find *Brazile* inapplicable in Ragland's case. Unlike *Brazile*, the evidence supported that Ragland aided and abetted Nichols, who, as already discussed, was shown to be the actual perpetrator of the Krystal armed robbery. Such was not the case in *Brazile*, in which no evidence was presented as to who actually committed the alleged burglary. *Id*. at 325-26. Here, having already found that the State presented sufficient evidence that Ragland aided or abetted Nichols in the commission of the armed robbery at Krystal, we find no merit in Ragland's claim that an accomplice instruction was not supported by the evidence in this case.

¶41. As to the complained-of instructions themselves, Ragland contends they failed to conform with the requirements of *Milano*, in which this Court adopted the Fifth Circuit's "Pattern Jury Instruction on Aiding and Abetting" in order to cure confusion over the issue.[2]

¶42. In *Milano*, this Court found error with jury instructions submitted in the case that permitted the jury to find the defendant guilty as an aider or abettor if the defendant "did any

---

[2] The instruction is as follows:

> The guilt of a defendant in a criminal case may be established without proof that the defendant personally did every act constituting the offense alleged. The law recognizes that, ordinarily, anything a person can do for himself may also be accomplished by that person through the direction of another person as his or her agent, by acting in concert with, or under the direction of, another person or persons in a joint effort or enterprise.

> If another person is acting under the direction of the defendant or if the defendant joins another person and performs acts with the intent to commit a crime, then the law holds the defendant responsible for the acts and conduct of such other persons just as though the defendant had committed the acts or engaged in such conduct.

> Before any defendant may be held criminally responsible for the acts of others it is necessary that the accused deliberately associate himself in some way with the crime and participate in it with the intent to bring about the crime.

> Of course, mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted the crime unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator.

> In other words, you may not find any defendant guilty unless you find beyond a reasonable doubt that every element of the offense as defined in these instructions was committed by some person or persons, and that the defendant voluntarily participated in its commission with the intent to violate the law.

*Milano*, 790 So. 2d at 185 (quoting Fifth Circuit Pattern Jury Instructions (Criminal) 2.06 (Aiding and Abetting) (Agency) (1998)).

17

act which is an element of the crime." *Milano*, 790 So. 2d at 184-85. *Milano* instructed that the problem with such an instruction is that it could be perceived as relieving the State of its burden of proof as to every element of the crime charged beyond a reasonable doubt. *Id.*

¶43.   But, while the *Milano* Court found the complained-of instructions in the case before it erroneous, the instructions nonetheless constituted harmless error when read together with other instructions that properly stated the law and set forth all the elements of the offense the State had to prove beyond a reasonable doubt. *Id.*

¶44.   Here, Ragland acknowledges that a proper elemental instruction can cure a defective aiding-and-abetting instruction.  But he contends that jury instruction ten, the elemental instruction setting forth the elements of armed robbery, exacerbated the incorrect accomplice instructions rather than cured them, because instruction ten references jury instruction nine, which Ragland contends is an elemental instruction for conspiracy.

¶45.   Ragland argues that, at a minimum, the cross-referencing of these instructions confused or misled the jury.  And when read together, instructions nine and ten also created a circumstance in which the jury could have found that, if Ragland committed the crime of conspiracy, then he automatically was guilty of armed robbery.

¶46.   We disagree.  As the State points out, while instruction nine discusses conspiracy, it is not an elemental instruction.  The elemental instruction for the crime of conspiracy was set forth in jury instruction eight.  Instruction nine, however, instructs the jury that if it found Ragland and Nichols conspired to commit armed robbery, it might consider the acts and

18

statements of either man committed in furtherance of the robbery as the acts, statements, and declarations of each. Instruction nine's last paragraph directs the jury as follows:

> Therefore, if you find from the evidence in this case, beyond a reasonable doubt, and to the exclusion of every other reasonable hypothesis other than that of guilty, that on or about November 17, 2014, [Ragland] conspired with [Nichols] to commit the crime of Armed Robbery, then you may consider the acts, statements and declarations of [Ragland] or [Nichols] committed in furtherance of the crime as the acts, statements and/or declarations of each.

¶47. We agree with the State that when read together, instructions nine and ten did not create a circumstance that, if the jury found Ragland committed the crime of conspiracy, he then also was guilty of the crime of armed robbery. Instruction ten still required the jury to find from the evidence that Ragland committed all the elements of armed robbery, and if the State "failed to prove any one or more of these elements beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis other than that of guilt, then you shall find the Defendant not guilty."

¶48. Here, we find that when read together, instructions nine, ten, eleven, twelve and fifteen do not constitute plain error.

### III. Ineffective Assistance of Counsel

¶49. Ragland's appellate counsel claims trial counsel was constitutionally ineffective for failing to object to the State's accomplice instructions and for submitting a deficient accomplice instruction of his own. For reasons just discussed, this was not ineffective assistance of counsel.

19

¶50. Ragland also has submitted a *pro se* reply brief, asserting additional ineffective-assistance-of-counsel claims. The record on appeal, however, does not allow us to address these additional claims on the merits.

¶51. Generally, ineffective-assistance-of-counsel claims are more appropriately brought in a post-conviction proceeding. *Archer v. State*, 986 So. 2d 951, 955 (Miss. 2008). On direct appeal, a reviewing court is limited to the trial-court record, which often times contains insufficient evidence to address an ineffectiveness claim adequately. *Id.*

¶52. That is the case here with Ragland's ineffectiveness claim(s). Therefore, we dismiss Ragland's ineffective-assistance-of-counsel claim(s) without prejudice, preserving Ragland's right to bring the claim(s) in a properly filed motion for post-conviction relief, if he so chooses.

## CONCLUSION

¶53. For the aforementioned reasons, we affirm Ragland's convictions of armed robbery and conspiracy to commit armed robbery.

¶54. **AFFIRMED.**

**WALLER, C.J., RANDOLPH, P.J., COLEMAN, MAXWELL AND ISHEE, JJ., CONCUR. KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J. CHAMBERLIN, J., NOT PARTICIPATING.**

**KING, JUSTICE, DISSENTING:**

¶55. Because insufficient evidence exists to support Ragland's convictions, I would reverse and render his convictions. I therefore respectfully dissent.

¶56.    Regarding Ragland's armed robbery charges, the State conceded that Ragland was not the individual who entered and robbed Krystal; instead, it argued that Ragland was an aider and abettor.  A person "who is present at the commission of a criminal offense and aids, counsels, or encourages another in the commission of that offense is an 'aider and abettor' and is equally guilty with the principal offender." *Swinford v. State*, 653 So. 2d 912, 915 (Miss. 1995) (internal quotations omitted).  So to convict Ragland for armed robbery, the State had to prove beyond a reasonable doubt that Ragland was both present at the robbery's commission *and* that he aided, counseled, or encouraged Nichols in the commission of the robbery.

¶57.    The State did produce sufficient evidence that Nichols robbed Krystal. Moreover, due to the evidence regarding the short time frame between the robbery and the stop, the State put forth sufficient evidence to support a finding that Nichols did not pick Ragland up after the robbery as Ragland had informed law enforcement.  While these facts may be sufficient to establish that Ragland was an accessory after the fact[3] to the robbery, they are plainly insufficient to establish beyond a reasonable doubt that Ragland aided and abetted Nichols in the armed robbery.

¶58.    The pertinent question here is whether, when the evidence is viewed "in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Cotton v. State*, 144 So. 3d 137, 142 (Miss. 2014) (internal quotations omitted).  The State failed to put forth any evidence of an act it contends

---

[3]Ragland was not charged with accessory after the fact.  *See* Miss. Code Ann. § 97-1-5 (Rev. 2014).

Ragland committed to aid, counsel, or encourage the armed robbery. Instead, it asked the jury to speculate that because Ragland was with Nichols *after the crime occurred*, because some evidence indicated that Ragland may have known about the crime *after the crime occurred*, and because some evidence existed that Ragland may have helped Nichols *after the crime occurred*, Ragland therefore must have aided and abetted Nichols in committing the crime.

¶59.    The majority argues that the evidence regarding the time it took to get from Krystal to the apartment complex "lends to a reasonable inference that Ragland was with Nichols at Krystal at the time of the armed robbery, and before it occurred." Yet, it is undisputed that Nichols was the lone robber inside the Krystal. At best, this evidence leads to a reasonable inference that Ragland was in the car at the time Nichols robbed Krystal; yet, nothing in that inference shows how Ragland acted to aid, counsel, or encourage the armed robbery. Indeed, nothing in that inference shows that Ragland even had *knowledge* that Nichols intended to commit the robbery before it occurred. For example, Nichols's revolver could have easily been concealed from Ragland before the robbery. Yet, the majority would convict a person simply for an inference that, shortly before a crime, the person was in the presence of someone else who committed that crime. The majority also points to the evidence in the car and that latex gloves were found on Ragland's person as evidence that he planned to participate in the armed robbery. The evidence in the car consisted of the proceeds of the robbery and items that could have easily been concealed from Ragland prior to the robbery. Thus, at best, the evidence in the car leads to an inference that Ragland knew of the robbery

after it occurred. But nothing about this evidence points to how Ragland acted to aid, counsel, or encourage the armed robbery, or that he even knew it was going to occur. The latex gloves likewise could easily have been given to Ragland after the robbery in case he handled its proceeds. And in any event, finding latex gloves on the person of a custodian, standing alone, is hardly sufficient evidence to convict Ragland of armed robbery and conspiracy.

¶60. "In circumstantial evidence cases, the State is required to prove the defendant's guilt not only beyond a reasonable doubt, but to the exclusion of every reasonable hypothesis consistent with innocence." *McRee v. State*, 732 So. 2d 246, 250 (Miss. 1999). As the majority admits, this case is "predicated wholly on circumstantial evidence." Maj. Op. at ¶25. This evidence, namely that items indicating the completion of a crime were in Ragland's line of sight and that the timeline of events indicates that Ragland was likely with Nichols before the robbery, is plainly not sufficient to exclude every reasonable hypothesis consistent with innocence. One reasonable hypothesis consistent with innocence for the crimes charged is that Ragland became aware that Nichols committed a robbery only after the completion of the robbery. "This evidence viewed in the light more favorable to the State[] gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged." *Id.* (internal quotations omitted). "Thus, a reasonable jury must necessarily have entertained a reasonable doubt." *Id.* (internal quotations and alterations omitted). The evidence was therefore insufficient to convict Ragland of armed robbery as an aider and abettor.

¶61. Nor was the evidence sufficient to convict Ragland of conspiracy to commit armed robbery, which required the State to prove beyond a reasonable doubt that Ragland entered into an agreement to commit the armed robbery. *See* Miss. Code Ann. § 97-1-1 (Rev. 2014). In the same way that the State failed to show any act Ragland committed to aid or abet the armed robbery, it likewise failed to introduce evidence that Ragland agreed to anything, except perhaps to Nichols's flight after the crime.

¶62. Because the State's evidence was woefully insufficient to convict Ragland of armed robbery or conspiracy to commit armed robbery, I would reverse and render his convictions.

**KITCHENS, P.J., JOINS THIS OPINION**.