# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-KA-00082-SCT

*JOHN HENRY WEBB a/k/a JOHN HENRY
ZACHARIAH WEBB a/k/a JOHN WEBB a/k/a
JOHN H. WEBB*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/18/2020 |
| TRIAL JUDGE: | HON. CELESTE EMBREY WILSON |
| TRIAL COURT ATTORNEYS: | ANGELA MARIE HUCK |
| | LUKE PATRICK WILLIAMSON |
| | MICHAEL HADEN LAWYER |
| | RAMON DAMAS |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MICHAEL HADEN LAWYER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LAUREN GABRIELLE CANTRELL |
| DISTRICT ATTORNEY: | JOHN W. CHAMPION |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/26/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KITCHENS, P.J., MAXWELL AND CHAMBERLIN, JJ.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1. A jury found John Henry Zachariah Webb guilty on one count of fondling and three counts of sexual battery of two underage girls, one of whom was his live-in girlfriend's daughter. The evidence showed that Webb—who was in his mid to late 30s—had intercourse with both girls numerous times, had the girls perform sexual acts on each other, and engaged in group sex with them. The oldest girl was fourteen.

¶2. On appeal, Webb asserts multiple evidentiary challenges against his convictions. He claims the judge erroneously admitted impermissible character evidence of his past, out-of-state sexual assaults of one of the victims. And he attacks several other evidentiary rulings as well as the weight of the evidence supporting his convictions. After review, we see no merit to his assertions.

¶3. As to Webb's character evidence claim, the trial judge instructed the jury it *could not* consider the out-of-state sexual conduct as evidence of guilt on the charged crimes. Instead, they could only consider these past sexual acts—which the judge deemed more probative than prejudicial—as proof of Webb's "motive, opportunity, and intent," among other purposes excepted by Mississippi Rule of Evidence 404(b). We see no error in that discretionary call. Nor do we see any merit to Webb's challenges to the judge's admission of screenshots of Snapchat messages with one of the minor victims, a photo of one of the victim's diary entries, and text messages between himself and his live-in girlfriend. The record supports that the Snapchat photo was properly authenticated, and the diary entry and text messages were relevant.

¶4. Webb's final challenge is to the weight of the evidence supporting his convictions. He challenges the credibility of both of the young victims, who detailed how he molested and repeatedly sexually assaulted them. But the jury decides witness credibility, not this Court. And in addition to the girls' graphic testimony, the jury also saw letters urging one of the girls to conceal the relationship, as well as a variety of other damning social media messages

2

between the girls and Webb. Thus, the evidence overwhelmingly favors the guilty verdicts. We affirm.

## FACTS AND PROCEDURAL HISTORY

¶5.     Anna was around nine years old when Zach Webb began dating her mother, Morgan.[1] Webb soon moved in with Morgan and her two daughters in their Moscow, Tennessee home. Eventually, Morgan began leaving her daughters at home with Webb while she worked night shifts. Webb's inappropriate behavior with Anna began when she started home-schooling in the seventh grade. When Anna was just eleven years old, she fell asleep while lying on the couch with Webb. Anna felt the then-thirty-five-year-old Webb "running his hands up and down [her] thighs and biting [her] neck and [her] ear." After that incident, Webb continued to routinely fondle Anna, eventually having sexual intercourse with her. In a diary entry from this time period, Anna wrote that she was "not even a virgin anymore" and that it was "okay, because technically [she was] married to Zach."

¶6.     When Anna was twelve, she and her family—along with Webb—moved to Hernando, Mississippi. Webb continued fondling and having sex with Anna after the move, with the two engaging in various types of sexual acts "almost every day." As Anna put it, the sex occurred in almost every room in the house. Morgan testified that she noticed Anna being "very flirty" and "hanging on . . . very close" to Webb. She also chided Anna for routinely sleeping in bed with Webb.

---

[1] For the victims' protection, they will be referred to by fictitious names—Anna and Vanessa.

3

¶7.    Soon after the move, Anna began attending Hernando Middle School. There, she met and became friends with Vanessa, a fourteen-year-old girl. The girls' friendship quickly evolved into a dating relationship. Anna also disclosed to Vanessa that she had been having sex with her mother's boyfriend (Webb) for a while.

¶8.    Later that month, Anna introduced Vanessa to Webb. And Vanessa began going to Anna's house on the weekends to see both Anna and Webb. Webb eventually began sexually abusing Vanessa too. Webb also prodded the two girls to perform sexual acts on each other while he watched. And he engaged in group sex with the girls. The three viewed themselves as being in a "three-way relationship."

¶9.    Webb began communicating with Vanessa every day via Snapchat and FaceTime. After Webb told Vanessa that he loved her, Anna grew jealous and began writing notes to Vanessa about the situation. In these notes, Anna referred to Webb as her boyfriend and warned Vanessa to keep their "relationship" a secret.

¶10.    Vanessa's mother eventually discovered the Snapchat messages between Vanessa, Anna, and Webb. She took screenshots of several of these messages. And she reported Webb's inappropriate behavior to law enforcement. Child Protective Services opened an investigation into Webb but ultimately closed it when Anna denied the allegations. Soon after, a school teacher confiscated a letter Anna had written Vanessa. In this letter, Anna went on a tirade about Vanessa ending her "relationship" with Webb and threatened physical violence if Vanessa told anyone about Webb. The school counselor questioned Vanessa about the letter. Vanessa came clean, admitting she and Anna were involved in a relationship

with Webb. A detective with the DeSoto County Sheriff's Department visited the school and collected the letter along with screenshots from conversations between Vanessa and Webb. Both girls were later interviewed by Healing Hearts Child Advocacy Center, where Vanessa disclosed the sexual nature of her relationship with Webb.

¶11. A DeSoto County Grand Jury indicted Webb in the summer of 2020 for a variety of sex crimes against Anna and Vanessa.[2] In October 2020, a jury found Webb guilty on one count of fondling and three counts of sexual battery. The trial court sentenced Webb to serve a total of sixty years' imprisonment.[3]

## DISCUSSION

¶12. On appeal, Webb argues the judge made four reversible evidentiary errors. He also asserts the verdict was against the overwhelming weight of the evidence.

---

[2] Count One—fondling of Vanessa in violation of Mississippi Code Section 97-5-23 (Rev. 2020); Counts Two and Three—sexual battery of Vanessa in violation of Mississippi Code Section 97-3-95(1)(c) (Rev. 2020); Count Four—sexual battery of Anna in violation of Mississippi Code Section 97-3-95(1)(d) (Rev. 2020). A superseding indictment was returned on June 17, 2020, to broaden the range of dates in Count Four to include events that occurred in Moscow, Tennessee (August 25, 2014 to September 30, 2017). A second superseding indictment returned on July 8, 2020, corrected this by including only the date range in which Webb and AE were residing in DeSoto County (June 1 to October 10, 2017).

[3] The judge sentenced Webb to thirty years in the Mississippi Department of Corrections on Count Two. On Count Three, the judge sentenced him to thirty years to be served consecutively with Count Two. On Count Four, he was sentenced to thirty years consecutive to Count Two and concurrent to Count Three. And on Count One, he was sentenced to fifteen years consecutive to Count Two, but concurrent to Counts Three and Four. So Webb must serve a total of sixty years.

## I. Evidentiary Calls

¶13.   Webb challenges a variety of the trial judge's evidentiary decisions, which we review for abuse of discretion. ***Bowman v. State***, 283 So. 3d 154, 164 (Miss. 2019). "A trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence." ***Id***. (quoting ***Hargett v. State***, 62 So. 3d 950, 952 (Miss. 2011)). Even when evidence is erroneously admitted, "this Court will affirm 'unless the error adversely affects a substantial right of a party.'" ***Id.*** (quoting ***Hargett***, 62 So. 3d at 953). After review, this Court finds no abuse of discretion in any of the disputed evidentiary rulings.

### A. Webb's Prior Sexual Abuse in Tennessee

¶14.   Anna testified that Webb began sexually assaulting her while in Tennessee and that Webb continued to do so when her family moved to Mississippi.

¶15.   At trial, Webb argued the Tennessee allegations should be excluded as impermissible character evidence. The State disagreed. It insisted that the previous sexual assaults showed a pattern of "grooming"and was necessary to tell the complete story. The State also argued the evidence qualified as Rule 404(b) evidence to show Webb's "motive, opportunity, [and] plan." The trial judge had researched the issue and agreed that prior uncharged sexual assaults are not necessarily banned character evidence. The judge pointed to ***Caldwell v. State***, in which this Court held prior sexual acts between the accused and victim are "admissible to show the accused's lustful lascivious disposition toward the particular victim, especially in circumstances where the victim is under the age of consent." ***Caldwell v. State***, 6 So. 3d 1076, 1078 (Miss. 2009) (quoting ***Walker v. State***, 878 So. 2d 913, 915 (Miss.

6

2004)). After considering the arguments, the judge found that evidence of the sexual assaults in Tennessee were not only relevant but more probative than prejudicial. So she admitted the evidence for the limited purposes described in Rule 404(b)(2). She also admonished the State to clarify which conduct occurred outside Mississippi. And she gave a limiting instruction, directing the jury not to consider the Tennessee conduct as evidence of Webb's guilt on the Mississippi charges.[4] Webb argues the judge abused her discretion by admitting evidence of the sexual assaults in Tennessee.

¶16.   Under Mississippi Rule of Evidence 404(b)(1), "evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But such evidence may be admissible for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." MRE 404(b)(2). This list of exceptions is not exclusive. MRE 404(b)(2) cmt.

¶17.   The State has a "legitimate interest in telling a rational and coherent story of what happened . . . ." *Brown v. State*, 483 So. 2d 328, 330 (Miss. 1986) (alteration in original) (quoting *Turner v. State*, 478 So. 2d 300, 301 (Miss. 1985); *Neal v. State*, 451 So. 2d 743,

---

[4] Jury Instruction No. 16, submitted by the State as S-9A, read as follows:

> Ladies and gentlemen of the jury, you have heard testimony concerning allegations of sexual abuse against the Defendant that are alleged to have taken place in Moscow, Tennessee. You cannot and must not simply infer that the Defendant acted in conformity with his previous actions and that he is therefore guilty of the charge for which he is presently on trial. Rather, this testimony should only be considered by you as evidence of the Defendant's motive, opportunity, intent, plan, knowledge, or absence of mistake or accident.

7

759 (Miss. 1984)). And when the story involves sexual acts that bear "overwhelming similarities" to the conduct at issue, they are "undeniably" admissible under Rule 404(b) as both motive and as evidence of a "common plan, scheme, or system." *Green v. State*, 89 So. 3d 543, 550 n.19 (Miss. 2012) (quoting *People v. Sabin*, 614 N.W.2d 888, 899 (Mich. 2000)). In *McGrath v. State*, we held the familial relationship of a sexually abusive stepfather was "particularly relevant" for Rule 404(b) purposes. *McGrath v. State*, 271 So. 3d 437, 441 (Miss. 2019). And here, much like a stepfather, Webb was Anna's mother's long-term, live-in boyfriend. So the same can be said for his familial-type relationship and everyday abuse opportunities.

¶18. But even though he had unfettered, continuous access to Anna, a family or parent-type relationship is not a prerequisite for admission of prior sexual acts as 404(b) evidence of opportunity or motive. Indeed, we have "emphasi[zed] that any evidence that tends to show a 'seemingly uncontrollable desire to partake in pedophilic sexual activities with young and developing female juveniles, is probative regarding motive.'" *Id.* at 442 (quoting *Young v. State*, 106 So. 3d 775, 779 (Miss. 2012)). And a jury may hear evidence of a "defendant's means of accomplishing these activities" if they "bear substantial resemblance to each other and with the present offense." *Id.* (quoting *Gore v. State*, 37 So. 3d 1178, 1186 (Miss. 2010)). Webb's desire to have sex with young and developing girls was overwhelmingly proven. And evidence of his sexual abuse in Tennessee is unquestionably similar to his continued pedophilic acts against both girls in Mississippi. So were Webb's motives and opportunities. His live-in status with Anna's family helped cultivate his sexual relationship

8

with a preteen that continued and evolved into illegal sexual conduct with both Anna and Vanessa in Mississippi.

¶19.    After review of the evidence and the judge's findings, we see no error in admitting the Tennessee acts under Rule 404(b) and deeming them more probative than prejudicial.

### B.    Anna's Diary Entry

¶20.    The State also sought to admit a photograph of one of Anna's diary entries taken from Webb's phone.  Anna had written in her diary that she was "not even a virgin anymore" and that it was "okay, because technically [she was] married to Zach."  The entry was written while she was living in Moscow, Tennessee.  A detective who had worked on the case served as the sponsoring witness.  Webb objected, arguing the entry was not relevant.  The trial judge withheld ruling on the photo until after the detective concluded his testimony.

¶21.    Webb's appellate challenges to the admission of the diary photo focus primarily on relevancy.  But he does throw in complaints that the copy of the photo provided to him was illegible, the bench discussions were not recorded, and the photo lacks foundation.  But he did not raise these arguments during trial.  "And '[t]his Court repeatedly has held that a failure to object contemporaneously at trial forfeits an issue on appeal.'" *Pulliam v. State*, 328 So. 3d 93, 97 (Miss. 2021) (quoting *Potts v. State*, 233 So. 3d 782, 788 (Miss. 2017)).  While forfeited error is reviewed for plain error only, "the Court's decision to utilize plain error is discretionary, not obligatory." *Flynt v. State*, 183 So. 3d 1, 14 (Miss. 2015).  While there is no obligation to consider these new claims, Webb made no mention of a pretrial

9

attempt to obtain a more legible copy of the diary entry. Nor did he request the bench discussions be recorded.

¶22. Considering his preserved relevancy objection, our rules are clear. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the case." MRE 401. "If the evidence has any probative value at all, the rule favors its admission." MRE 401 cmt. There is little question about the diary entry's relevancy. Anna testified she wrote this entry while living in Tennessee. And it showed her written justification for not being a virgin—her belief she was in a special relationship with Webb. From this, a reasonable juror could conclude Webb had manipulated her into believing the unlawful sexual conduct was okay, or at a minimum, that she was in a sexual relationship with Webb—either of which are relevant to the charged offenses.

### C. Screenshots of Snapchat Communications Between Webb and Vanessa

¶23. Webb next argues the trial judge wrongly admitted screenshots of Snapchat messages purportedly between Webb and Vanessa. He insists the screenshots were not properly authenticated. This Court disagrees.

¶24. Snapchat is a popular messaging app, often utilized on smartphones, that lets users exchange photographs, videos, and text messages (called snaps). *Thomas v. Cope*, No. 7:20-CV-14 (HL), 2021 WL 4944802, at *2 n.3 (M.D. Ga. Oct. 22, 2021) (citing https://phys.org/news/2018-06-snapchat.html). The primary distinction between Snapchat and typical text messaging is that the images and messages contained in a Snapchat (snaps)

disappear after being viewed by the recipient. *State v. M.P.*, 13 Wash. App. 2d 1007 n.2 (Wash. Ct. App. 2020) (citing *Nelson v. Duvall*, 387 P.3d 1158, 1161 n.1 (Wash. Ct. App. 2017)). Although Snapchat automatically deletes photos and messages, a recipient of the snap can save one-on-one chats by taking a screenshot of the message or photograph. *United States v. Seme*, No. 20-CR-10245-ADB, 2021 WL 5111865, at *1 (D. Mass. Nov. 3, 2021). This can be accomplished using a smartphone's screenshot function or by using a separate device to photograph the message. *Id.*

¶25. Here, Vanessa testified that her mother—who accessed Vanessa's Snapchat account on her phone—took screenshots of photos and messages exchanged between Webb and Vanessa before the images disappeared. At trial, Webb sought to exclude the screenshot messages between Webb's Snapchat account—which contained his photo and listed "zwebb30" as the user—and Vanessa's account. The challenged messages contained two photographs, including one of Webb with his dog and another of Vanessa and Webb. There were also screenshots of five pages of Snapchat messages, purportedly between Webb and Vanessa.

¶26. In these messages, the then-fourteen-year-old Vanessa said she wanted Webb "to come hold [her] and when my mom gets home shoot her." Webb laughed off the idea of shooting Vanessa's mom. But he typed that he did "love the holding idea." The messages also discussed "marrying." And in the snap exchange, Vanessa noted her confusion about the "three of us dating." Webb appeared unsure about the three-way relationship too, claiming, "[t]his is kind of unprecedented territory for me[.]" As Webb put it, it was "funny

11

to watch all three of us go from being ok to territorial and back again really." When Webb told Vanessa, "I wanna wrap you up in my arms and hold you in the bed until you go to sleep[,]" Vanessa replied, "I want u to." Webb told Vanessa he "lov[ed]" her and "[s]he needed to get ungrounded. So you'll have a bit more freedom." These exchanges and the photos made up the gist of the screenshots the State sought to admit.

¶27. Webb primarily argues the screenshots were not properly authenticated because (1) they were taken by Vanessa's mother, a non-testifying witness, and (2) someone else (namely Anna) could have accessed his phone to send the messages.

### 1. Authenticating Social Media Evidence

¶28. In *Smith v. State*, this Court noted the "unique issues" in play when authenticating electronic social media information. *Smith v. State*, 136 So. 3d 424, 432 (Miss. 2014). Though we recognized these challenges, we made clear that "[e]lectronic evidence may be authenticated by the traditional means, and is adequately covered by the current rules of evidence." *Id.* Under Mississippi's evidentiary rules, to properly authenticate evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." MRE 901(a). This is typically met through witness testimony from someone with knowledge that "an item is what it is claimed to be." MRE 901(b)(1). Once a party makes a prima facie showing of authenticity, the evidence goes to the jury, which ultimately determines the evidence's authenticity. *Young v. Guild*, 7 So. 3d 251, 262 (Miss. 2009). In other words, the judge functions as initial gatekeeper of the reliability of the evidence, with the jury assessing the weight and credibility of admitted evidence.

¶29.    In evaluating what is required to establish a prima facie showing of authenticity of social media evidence, in **Smith**, this Court leaned heavily on Texas law.  Because social media accounts can be fabricated, we agreed,  "the fact that an electronic communication on its face purports to originate from a certain person's social networking account is generally insufficient standing alone to authenticate that person as the author of the communications." **Smith**, 136 So. 3d at 433 (citing **Campbell v. State**, 382 S.W.3d 545, 550 (Tex. App. 2012)). Like the Texas courts, we found "something more" is required.[5]  **Id.**  And in **Smith**, because "something more" was not proven, this Court found error—albeit harmless—in the trial judge's admission of Facebook communications based on "simply a name and small, blurry photograph" of the defendant.  **Smith**, 136 So. 3d at 433.[6]

---

[5]

> For example, the purported sender admits authorship, the purported sender is seen composing the communication, business records of an internet service provider or cell phone company show that the communication originated from the purported sender's personal computer or cell phone under circumstances in which it is reasonable to believe that only the purported sender would have access to the computer or cell phone, the communication contains information that only the purported sender could be expected to know, the purported sender responds to an exchange in such a way as to indicate circumstantially that he was in fact the author of the communication, or other circumstances peculiar to the particular case may suffice to establish a prima facie showing of authenticity.

**Smith**, 136 So. 3d at 433 (citing **Tienda v. State**, 358 S.W.3d 633, 639-41 (Tex. Crim. App. 2012)).

[6] *See also* **Tienda**, 358 S.W.3d at 641-42 ("That an email on its face purports to come from a certain person's email address, that the respondent in an internet chat room dialogue purports to identify himself, or that a text message emanates from a cell phone number assigned to the purported author—none of these circumstances, without more, has typically been regarded as sufficient to support a finding of authenticity.").

### 2.     Webb's Authenticity Challenges

¶30.     Here, unlike in ***Smith***, Webb is not claiming the messages stemmed from a bogus account opened in his name.  Rather, Webb asserts two different authenticity challenges, one attacking the sponsoring witness and the other suggesting Anna possibly accessed his account to create the complained-of messages.  He also briefly argues that the screenshots were more prejudicial than probative.

### a.     Sponsoring Witness

¶31.     Webb first insists the screenshot messages, purportedly between him and Vanessa, were not properly authenticated because Vanessa's mother, who physically took the screenshots, did not testify as to their authenticity.  The problem with Webb's argument is that a screenshot is just a photograph that has captured what is depicted on a smartphone's screen.  And there is no requirement that a photograph be authenticated or sponsored by the photographer.  Instead, any person with the requisite knowledge of the facts represented in the photograph may authenticate it.  ***Jackson v. State***, 483 So. 2d 1353, 1355 (Miss. 1986) (no requirement that photographer testify when other competent testimony supports that photograph represents what it purports to be).  Here, Vanessa testified about participating in the communications captured in the screenshots and that they were a true and accurate depiction of her Snapchat conversations with Webb.  So there is no merit to Webb's argument challenging the photo's sponsoring witness.

## b. Lack of Foundation

¶32.    Webb centers his second authenticity challenge on the State's failure to show it was he—and not Anna—on the other side of these communications with Vanessa.  But what Webb misses is that the State need only prove a sufficient prima facie case of authentication, which it did.  At that point, the jury—not the trial judge—is tasked with deciding the ultimate weight and worth of the evidence.  So what Webb is really attacking is the weight of the evidence of the screenshot messages, not their admissibility.[7]

¶33.    The test for authenticating and admitting electronic evidence requires the proponent offer a foundation from which the jury could reasonably find the evidence is what the proponent says it is.  MRE 901.  But as noted in *Smith* and *Tienda*, because of varied concerns with fabricating social networking applications and other like evidence, "something more" than just a photo and account name is required to make a prima facie case of authentication.  *Smith*, 136 So. 3d at 433; *Tienda*, 358 S.W.3d at 639-41.

¶34.    This "something more" may be established in a variety of different ways, some of which were listed in *Smith*, including "the purported sender respond[ing] to an exchange in such a way as to indicate circumstantially that he was in fact the author of the communication, or other circumstances peculiar to the particular case may suffice . . . ." *Smith*, 136 So. 3d at 433.

---

[7] The possibility that someone else may have been using a device goes to the *weight* of the evidence, not its authenticity.  *Garcia v. State*, 300 So. 3d 945, 973 (Miss. 2020) (citing *Holzheuser v. State*, 828 S.E.2d 664 (Ga. Ct. App. 2019)).

¶35. Here, Vanessa testified that she knew it was Webb communicating with her. Not only was this his personal account—containing his username "zwebb30"—but it was the only account he had ever used to communicate with her. He also crafted his written communications in the same way he spoke to her. She explained the Snapchat messages stemmed from conversations that the two had previously had in person. And on the "rare[]" occasions Anna used Webb's Snapchat account to communicate with Vanessa, Anna identified herself.

¶36. Even though this was likely sufficient to prove a prima facie case of authenticity, at this point in trial, the judge felt she still needed more foundation before admitting the messages.

¶37. Vanessa gave additional testimony about the messages. And Anna's mother, Morgan, also testified. She recognized the account—which in addition to Webb's username also contained his photo—as the one Webb used to communicate with her. She also asked Webb how Vanessa's mom "got y'all's conversation off Snapchat because as soon as I close it, not even completely close the app, it deletes the conversation." Webb told Morgan he thought "her settings are set up different, that is saves all convos." The judge admitted the photos during Morgan's testimony.

¶38. While Webb's attorney repeatedly suggested someone else could have accessed Webb's phone, he misses that this possibility does not prevent authentication. That is because the trial judge, as gatekeeper, need not find the evidence is necessarily what the proponent claims—only that there is sufficient evidence that the jury ultimately might do so. The fact

16

the messages came from Webb's account, when combined with the author's messages and responses, similar conversational tone, and post-screenshot discussions with Morgan, was more than sufficient for the jury to make this determination.[8]

### c.   Unfair Prejudice

¶39. Webb also briefly argues the trial court erred by not ruling on his objection that the messages were "presented out of context," irrelevant, and more prejudicial than probative. The relevancy of these communications to the charged crimes is obvious. And while a judge "*may* exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice," the judge did not believe the messages were out of context. MRE 403 (emphasis added). We see nothing to suggest Webb was unfairly prejudiced. The bottom line is that this Court will only reverse a trial judge's evidentiary ruling if it "adversely affects a substantial right of a party." *Bowman*, 283 So. 3d at 164 (quoting *Hargett*, 62 So. 3d at 953). And Webb's substantial rights were by no means affected.

¶40. We find no error, much less reversible error, in admitting the Snapchat screenshots.

### D.   Text Messages between Webb and Morgan

¶41. The State also introduced text messages between Webb and Morgan, Anna's mother. The judge admitted the messages over Webb's relevancy objection. He continues to challenge the relevancy and "voluminous" nature of the messages, which he urges contain mundane topics.

---

[8] "On issues of witness credibility, the jury determines the weight and credibility of each witness's testimony." *Thomas v. State*, 48 So. 3d 460, 469 (Miss. 2010) (citing *Nelson v. State*, 10 So. 3d 898 (Miss. 2009)).

¶42. The bulk of the messages referred to Webb's inappropriate relationship with Anna. In them, Morgan accused Webb of having sexual feelings towards her young daughter. And Webb quipped that he did. That some of the text messages contained discussions of routine errands, dinner options, and everyday life does not negate the probative value of the damning ones. Nor has Webb shown how he was in any way prejudiced by admitting the remaining messages. Thus, the judge did not abuse her discretion.

## II. Weight of the Evidence

¶43. Finally, Webb argues the jury's verdict was against the weight of the evidence. When reviewing challenges to the weight of the evidence, this Court views the evidence "in the light most favorable to the verdict[.]" *Little v. State*, 233 So. 3d 288, 292 (Miss. 2017) (citing *Lindsey v. State*, 212 So. 3d 44, 45 (Miss. 2017)). This Court will only disturb a verdict "when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* (citing *Lindsey*, 212 So. 3d at 45).

¶44. Webb was convicted of four felony counts but does not delineate which of the counts he is challenging. Instead, he pitches a general argument that Anna and Vanessa were not credible and their stories were not corroborated. Generally, witness credibility issues are decided by the jury, not appellate courts. *Nelson*, 10 So. 3d at 905. While Webb's counsel focused his strategy on attacking the young girls' credibility, both underage girls gave graphic details of Webb's illegal sexual conduct—including fondling, having them perform sexual acts on one another, and engaging in sexual intercourse with each girl and in a group setting. And the jury obviously believed them. There were also various corroborating letters,

18

a written request to conceal the unlawful relationship, text messages, inappropriate photos of the girls on his phone, and Snapchat messages between Vanessa and Webb.

¶45. Viewing this evidence in the light most favorable to the verdict, the evidence overwhelmingly supports the four guilty verdicts.

## CONCLUSION

¶46. The trial judge did not abuse her discretion by admitting the challenged evidence. And the jury's verdict was supported by the weight of the evidence.

¶47. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**